1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4     THE HON. JUDGE GARY ALLEN FEESS, JUDGE PRESIDING

5

6    UNITED STATES OF AMERICA,          )
                                        )
7                    Plaintiff,         )
                                        )
8         vs.                           ) NO. 05-CR-398-GAF
                                        )
9    STUART H. WOLFF,                   )
                                        )
10                   Defendant.         )
     _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               Los Angeles, California

16             Monday, December 21, 2009

17

18

19

20

21

22

23      LISA M. GONZALEZ, CSR 5920 - Official Reporter
                   Roybal Federal Building
24          255 East Temple Street, Room 181-C
                   Los Angeles, CA  90012
25             (213) 621-7709; csrlisag@aol.com

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:   THOMAS P. O'BRIEN
                           UNITED STATES ATTORNEY
 3                         BY:  MICHAEL R. WILNER
                           BY:  MICHAEL J. RAPHAEL
 4                         ASSISTANT UNITED STATES ATTORNEYS
                           United States Courthouse
 5                         312 N. Spring Street
                           Los Angeles, California 90012
 6                         (213) 894.0687/3391

 7   FOR THE DEFENDANT:    GREENBERG TRAURIG
                           By:  JOHN F. GIBBONS, ESQ.
 8                         BY:  DANIEL D. RUBINSTEIN, ESQ.
                           77 West Wacker Drive
 9                         Suite 2500
                           Chicago, Illinois  60601
10                         (312) 476.5017

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    *Los Angeles, California, Monday, December 21, 2009*

2                    *9:54 a.m.*

3                    *-o0o-*

4          THE CLERK:  Case number CR-05-398-GAF,

5    United States of America versus Stuart Wolff.

6          Counsel, please state your appearance.

7          MR. WILNER:  Good morning, Your Honor.

8    Michael Wilner and Michael Raphael for the United States.

9          MR. RAPHAEL:  Good morning.

10         MR. GIBBONS:  Good morning, Your Honor.

11   John Gibbons and Dan Rubinstein, who is present before the

12   Court.

13         MR. RUBINSTEIN:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         All right.  The matter is on calendar today for a

16   motion seeking an evidentiary hearing pretrial regarding the

17   activities of Pricewaterhouse personnel, in connection to

18   document retention and document modification.

19         I've read the voluminous materials that the

20   parties have submitted in this case, and it appears to me

21   that the government is essentially correct in its

22   opposition.  The predicate ordinarily for --

23         First of all, it seems to me that it's not like a

24   motion for -- to suppress, or a motion to preclude the

25   introduction of statements for Miranda violations, that sort

```
 1   of thing, where -- where defense wants the Court to do
 2   something, and before I can determine whether I can do it or
 3   not, I have to decide what the facts are; and the
 4   determination of the facts in those circumstances might
 5   require an evidentiary hearing, that's certainly possible.
 6   But the evidentiary hearing is really ancillary to a request
 7   to do something else.
 8               In this case, it seems that the supposed dispute
 9   between the government and the defense lawyers is just a
10   dispute as to what the facts of the case are.  Really, it's
11   a question as to what is the evidence that would support the
12   government's case as to whether Mr. Wolff is guilty or not
13   guilty of the crimes that he's charged with committing.  So
14   in that sense, it seems like the government's
15   characterization of what's being requested as pretrial
16   depositions is supported.
17               If -- looking at the materials, I'm certainly
18   persuaded -- and I even think that the government is
19   somewhat persuaded, based upon what the government's had to
20   say -- that there's some question regarding some of the
21   things that were done by Pricewaterhouse personnel with
22   respect to the documents -- the documentation in question
23   that's relevant to this case, principally, the workpapers
24   for quarterly reports, but it doesn't mean that we should be
25   having an evidentiary hearing now.  It does seem to mean
```

1    that Mr. Gibbons and his team could put on evidence of that

2    to impeach or demonstrate a lack of corroboration of

3    insiders who would testify regarding statements made or

4    information withheld from Pricewaterhouse, but the

5    government's disclosed that at this point.  The government's

6    told them, Here's what people are now saying about what

7    happened at the time; so it's -- it's a situation where, as

8    I read it, I'm not persuaded that there's any basis to have

9    an evidentiary hearing.

10           Furthermore, it is certainly true that the

11   government in this case has said, look, because of these

12   issues, you know, we're just going to eliminate the counts,

13   the 10 through 14, and strike the fourth object, conspiracy,

14   which my tentative would be to grant.  I don't think that

15   there's anything improper about that.  The suggestion that

16   this is like the Bakshinian case, which stated a rule which

17   I think is debatable anyway, but it's not a Bakshinian case,

18   where the government is attempting to pursue an inconsistent

19   theory; it's just pursuing a narrower theory and eliminating

20   part of the case.

21           The government is not saying that the events

22   didn't happen, it's just saying we're not going to use

23   Pricewaterhouse people to prove it.  If the defense team

24   wants to call those Pricewaterhouse people and put them on

25   and suggest that they're not being honest, and that what

1    they have to say is such that undermines the government's

2    case and then view it as exculpatory and **Brady** material,

3    fine, do it at the time of the trial, but I don't see any

4    basis at this point for conducting an evidentiary hearing.

5           Mr. Gibbons, I don't know if it's you or somebody

6    else for the team that's going to speak, but I'm guessing

7    somebody wants to say something at this point.

8           MR. GIBBONS:  Well, Your Honor, it will be me,

9    and, yes, I would like to -- obviously, I'm mindful of the

10   Court's comments.  I guess I would like to emphasize a few

11   points that I think the Court -- or at least we attempted

12   through our pleadings to inform the Court.  The reason we

13   believe a hearing is needed now is because at trial it would

14   be too late.  The government will have already put on their

15   case, and what we've tried to --

16          THE COURT:  Why is it too late?

17          MR. GIBBONS:  Let me explain why.  Because the

18   case, at its core -- and I don't think this is really going

19   to be disputed by the government -- centers around lying to

20   the outside auditors of PwC or hiding things from the

21   outside auditors of PwC.  That sits at the core of the case.

22   The only way that the defense can defend that case is to

23   have an evidentiary record that was undoctored and

24   unmodified.  We don't have that.  It's a shattered glass.

25   We've proven that these modifications went right to the core

1    of the case.

2         In fact, in the first trial, the government argued

3    that the most powerful evidence of my client's guilt was

4    those workpapers.  Now, the very workpapers that we've

5    proven now have been modified.  We now have a government

6    proposition that says we will eliminate the PwC witnesses,

7    we will eliminate those workpapers, and we will move ahead

8    with what I consider a bottlehead-like trial.

9         THE COURT:  Wait a second.  You've got multiple

10   witnesses -- multiple witnesses from Homestore who say:  We

11   were lying to the accountants; right?

12        MR. GIBBONS:  That they were lying to the

13   accountants --

14        THE COURT:  Yes, right.

15        MR. GIBBONS:  -- right.  But that's not the case

16   against my client, Your Honor.  The case against my client

17   sits in three or four meetings where they say the indicia of

18   guilt in relation to Stuart Wolff does not lie in a

19   quintessential security fraud case where somebody explained

20   GAAP and recognition rules.  The whole suggestion was in the

21   first trial -- and I assume it will be the same -- they will

22   have a Bakshinian problem -- to say that PwC was lied to.

23   And what is the way to see whether that happened or not?

24   The way to see whether that happened or not --

25        THE COURT:  Well, one way is to ask the people who

```
 1    dealt with PwC whether they lied to them.
 2          MR. GIBBONS:  Exactly.  But here's the problem.
 3    How do you cross-examine that?  You would normally have
 4    contemporaneous workpapers that would tell you, as the
 5    defense and the government, exactly what was told to PwC,
 6    exactly what was given to PwC; you would have contemporary
 7    workpapers that this company had to have.
 8          We've now proven, and I don't think there's going
 9    to be any objection by the government of this, that those
10    papers were modified, they were doctored in the exact area
11    that is at the core of this case.  What was told to them?
12    Exhibit 710, 711 are prime examples of that, Your Honor,
13    that were introduced in the first trial.  They contained a
14    series of management representations that there was no
15    linkage between the revenue deals and the cost deals.
16    Important representations that were not in the original
17    draft of those workpapers.  Now, we all know that if
18    management reps were indeed made, they would have been in
19    the first draft and every draft of that paper.
20          THE COURT:  That's the assumption that, I think,
21    is not necessarily supportable.  I mean, maybe yes; maybe
22    no; but the question is what is -- if the proof that you say
23    is correct -- and I don't know that the government said that
24    they accept that you have proved certain things -- maybe
25    they have.  We'll hear from them in a minute -- but it seems
```

1    to me that what you've got is a situation where you've

2    either got Pricewaterhouse who's complicit with Homestore

3    personnel and trying to cover that up, or that they were

4    less than effective; that they didn't do their job the right

5    way, and now they want to cover that up.  That's why I say I

6    don't necessarily buy your premise because maybe they just

7    messed up and now want to make themselves look better after

8    the fact.  But you can bring all of that out at the time of

9    trial and say, you know:  The government's got this argument

10   that they don't have anything over here that is reliable

11   that they can point to to support the testimony of those

12   from Homestore who are saying this is what we did.  That

13   would be your argument, I would assume; right?

14           MR. GIBBONS:  Well, it would certainly be part of

15   the argument, Your Honor; there's no question about that.

16   We also have issues that we've framed in relation to **Brady**.

17           THE COURT:  Haven't they just given you Brady

18   material?  I mean, haven't they provided everything that

19   they've been able to determine, from Pricewaterhouse?

20           MR. GIBBONS:  I don't believe so, Your Honor, and

21   I can give you an easy example.  We provided to the

22   government in July of this year all of our evidence -- the

23   Court knows that -- and part of that forensic material we

24   provided to the government were a series -- a series of

25   modified and doctored and really created workpapers --

1   memos -- having to do with the transactions at issue in the

2   case that were from the year 2000.

3           THE COURT:  Pricewaterhouse documents you're

4   talking about?

5           MR. GIBBONS:  Right.  They were completely

6   created, for the most part, a whole bunch of them, in

7   November and December of 2001, after the commencement of the

8   internal.  We sent that information to the government, and

9   we asked them to investigate it.  Based on the 302s, no

10  Pricewaterhouse person was asked one question in relation to

11  the modifications of the 2000 workpapers.

12          THE COURT:  I see.  So you're saying that the

13  government -- it is interesting, Mr. Gibbons, that many

14  former assistants are very good about advising the

15  government about how they ought to investigate cases, and I

16  consider this to be some of that advice, but I don't know

17  that the government has any obligation at this point to

18  investigate Pricewaterhouse for the purpose of further

19  determining whether any information that would be of value

20  to you is out there.  I mean --

21          MR. GIBBONS:  I'm sorry.

22          THE COURT:  Do they?

23          MR. GIBBONS:  I absolutely believe they do.  I

24  think **Brady** and its progeny -- **Hanna**, **Morris**, **Ylst** -- all

25  those cases stand for the proposition that when there are

```
 1    red flags, when there is likely exculpatory material that is

 2    available, the government has a duty and an obligation to go

 3    ferret it out.  That's -- that's the core of what those

 4    cases stand for, and I don't believe any of that's been done

 5    particularly after July of 2009.

 6              THE COURT:  What's there beyond -- what else do

 7    you think is there?  What do you posit is in that record

 8    that would be useful to you beyond what you've already

 9    determined yourself?

10              MR. GIBBONS:  I think what we would find is that

11    in 2002, very early on in the investigation, the government

12    issued a subpoena to Pricewaterhouse asking for all of the

13    relevant records -- they knew exactly what to ask for.  They

14    then did not follow up on that.  What they got in 2002 was

15    electronic versions of Pricewaterhouse's workpapers.  They

16    never tendered that to the defense in 2005 upon the

17    indictment of Mr. Wolff.  We never got that, any of that,

18    until we press, in late 2008, and had a chance to review it

19    in 2009.  And you know what it showed?  It showed the extent

20    of the modifications that we've now illuminated in our

21    briefs.  If the government had done that -- and this is a

22    *Brady* issue -- in 2002, and had tendered it to the defense

23    in 2005, Pricewaterhouse would have been seen in a

24    completely different way.

25              And here's the prejudice:  In the interim,
```

```
 1    Your Honor -- and this is what I think an evidentiary
 2    hearing under *Hanna* would mandate -- is we would get to the
 3    depth and breadth, timing, and circumstances surrounding
 4    that, and I posit what we would likely find in an
 5    evidentiary hearing is all that missing evidence.  The
 6    e-mails that were never retrieved.  The -- the -- yeah,
 7    access database, which would have shown all of the records
 8    that went from Homestore to PwC, the back-up tapes; things
 9    that would have -- all the secondary material that would
10    have allowed both the government and the defense to piece
11    together exactly what happened here was available to the
12    government in 2002 and all the red flags were going off.
13           When we saw, a month into this investigation, when
14    Dan and I -- Mr. Rubinstein and I came on board, what you
15    could see was the series of modified workpapers on the
16    weekend of December the 8th and 9th.  And an alarm
17    immediately went off saying:  What happened here?  The only
18    way we could figure out what happened was to do an
19    exhaustive electronic forensic examination that was only
20    available to us in 2009, not before, but was available to
21    the government in 2002.  That's a *Brady* violation.  That's
22    suppression of evidence that would have inured to the
23    benefit of the defense.
24           We have a right, I believe, under *Hanna* and the
25    law, to have an evidentiary hearing to explore those very
```

```
1    issues.  That cannot be done in the context of a trial.

2           THE COURT:  Suppression of evidence by the

3    government?  Is that what it comes down to?  You're saying

4    you want an evidentiary hearing to determine whether or not

5    the government suppressed evidence in 2002 that would have

6    been exculpatory?

7           MR. GIBBONS:  Sure.

8           THE COURT:  That's it.

9           MR. GIBBONS:  That's part of it.

10          THE COURT:  Well, don't -- no, no, no.

11          MR. GIBBONS:  No, that's one of the arguments

12   we've made.

13          THE COURT:  I want to know what you want.  I don't

14   want what arguments you've made.  I've read your papers.

15   You've made a lot of arguments, some of which are not very

16   meritorious at all, but I figure that you've spent this

17   amount of time.  There must be something, some objective

18   that you're trying to achieve that perhaps I haven't figured

19   out, and I don't think anywhere I've seen it so clearly

20   articulated as you're saying that what I want is an

21   evidentiary hearing so that the defense can pursue claims

22   that the government suppressed evidence that would have been

23   favorable to the defense in 2002?

24          MR. GIBBONS:  Correct.

25          THE COURT:  That's what you think is there?
```

```
 1                 MR. GIBBONS:  I do believe it's there.

 2                 THE COURT:  And that evidence would be something

 3     in addition to what you've got now?

 4                 MR. GIBBONS:  Yes.

 5                 THE COURT:  Let's go back to my question, then.

 6     What do you think it is, because I'm not clear in my mind

 7     looking at this record what it even might be.

 8                 MR. GIBBONS:  I think we would have PwC witnesses

 9     on the stand who would tell you exactly what existed in 2002

10     and when it went missing.  Those questions have never been

11     asked; those witnesses have never been under

12     cross-examination.

13                 THE COURT:  And you can't do that at trial?

14                 MR. GIBBONS:  It's not part of the trial.  We

15     couldn't -- we couldn't gather that evidence during the

16     trial and then file the right constitutionally based motion.

17     I think it has to be done in a Hanna-like evidentiary

18     hearing, and Judge Trott instructed that that is the

19     preferred route, to do it in an evidentiary hearing.

20                 THE COURT:  All right.  Let me hear from the

21     government.

22                 MR. WILNER:  May I use the lectern, Your Honor?

23                 THE COURT:  Yes.

24                 MR. WILNER:  Thank you, Your Honor.

25     Michael Wilner for the United States.  And thank you for the
```

1   lengthy, I take it, as a tentative, at the beginning because

2   it seems that the issues are in focus.

3          I'm happy to respond to whatever points the Court

4   wants to bring up or specifically in response to Mr. Gibbons

5   presentation.

6          THE COURT:  I guess the real question is this:

7   Mr. Gibbons asserts that if -- if one looks at the record

8   now, one can determine that Pricewaterhouse -- some

9   Pricewaterhouse employees or officials have caused

10  modifications to be made to certain documents and that

11  Pricewaterhouse did not adequately retain certain documents

12  that may be of use or relevance to this particular lawsuit.

13         And, in particular, he asserts that the government

14  knew about that -- apparently knew about that in 2002 and

15  suppressed evidence, and so the articulation hear as to the

16  reason for the evidentiary hearing is that it is to explore

17  the suppression of **Brady** material that the government should

18  have identified and produced to the defense, and that that

19  would have made a difference because it would have created a

20  different perception of Pricewaterhouse.  So let's start

21  with that.

22         MR. WILNER:  Certainly, Your Honor.  Your Honor,

23  the initial investigation and dealings between "the

24  government" and PwC was done by the Securities & Exchange

25  Commission; that is, early on in the investigation, and they

1    put in a number of subpoenas and letters between the SEC

2    staff and Pw that an extensive production of

3    Pricewaterhouse's workpapers -- the notes that these people

4    took while they were doing their accounting work -- that

5    that material was presented to the SEC.  The SEC, by the

6    way, also told Pw, you may continue to do your audit work

7    because Homestore at the time, even as things were being

8    discovered about what had happened at the company, it was

9    still a public-reporting company with an obligation to get

10   an audit file.  So the company and the company's auditors,

11   Pw, continued to do work with respect to an annual audit.

12          However, it's my understanding that there was a

13   hard copy set of the workpapers from Pricewaterhouse sent to

14   SEC, and I believe there was also an electric set that was

15   produced to the SEC in 2002.  This case was indicted in

16   2005, Your Honor, after ten other people had been charged in

17   the investigation.

18          All of the materials at the SEC, both here in

19   Los Angeles and in Washington D.C., in a parallel

20   investigation of America Online, all of that material was

21   made available to the defense.  We opened the doors of the

22   SEC.  The previous defense team for Mr. Wolff, went over to

23   SEC and got all of the materials that were at the SEC and

24   had access to all of it -- more access, actually, than I

25   had -- I've never looked at the electronic workpapers in my

```
 1   role as a federal prosecutor, and the reason, Your Honor, is
 2   something the Court said before, which is we weren't
 3   investigating Pricewaterhouse.  Pricewaterhouse, it was made
 4   very clear, with very convincing evidence, had not
 5   participated in this scheme and actually played an important
 6   role in ferreting it out.  And so we did not investigate
 7   them.  And when information came in in the form of the
 8   workpapers and additional materials that were produced to
 9   the SEC by the audit committee, the investigating committee
10   of the company, we took in all that material, and that
11   material, Your Honor, was made available to the defense.
12            I would also point out, Your Honor -- and we
13   didn't delve into this in great detail in our papers because
14   I didn't want to bury the Court in weeds of this matter, but
15   the Pricewaterhouse people were questioned and were
16   cross-examined in civil litigation -- I think it was a case
17   that was before this Court before it was transferred on --
18   in litigation, in which one of Mr. Wolff's criminal defense
19   lawyers was present.  Pricewaterhouse people were under oath
20   in 2003 and asked questions about their work and were
21   given -- marked as exhibits in the deposition -- copies of
22   some of the modified, altered, whatever the adjective, some
23   of the workpapers, Your Honor, some of the workpapers that
24   have those coaching notes about which the defense makes so
25   much noise now.  That was produced in the civil litigation.
```

1    Part of what's gone on in *Brady* -- I understand our

2    obligations, Your Honor; I understand our responsibilities,

3    but there is also the issue of prejudice.  If they had that

4    material, and if they had access to that material in the

5    civil case six years ago now, it's very hard to see how

6    there is prejudice today, Your Honor.

7             And although, Your Honor, there has now been

8    additional work, and they've gone into the metadata and

9    looked at the electronic aspects of the workpapers to see

10   that the workpapers were in progress, and they did change

11   over time, one thing has not changed, Your Honor.  Separate

12   and apart from the notes that the people took and the notes

13   that they added to, all of the Pricewaterhouse people that

14   we re-interviewed say the same thing about what really

15   happened during the course of the scheme; that is, in the

16   spring and summer and early fall of 2001, they all say

17   consistently that they were not involved in this; that they

18   did not have correct information about these transactions;

19   that they were lied to.

20            And the Court is correct that the government can

21   prove the other side of it; that is, we have the party that

22   was lied to, Pricewaterhouse, and we have the party that did

23   the lying.  The role of Homestore executives and accounting

24   and finance people who testified and gave information that

25   they lied to Pricewaterhouse in a circumstance, Your Honor,

```
 1    that is important, which is that these were people who were

 2    charged, or to be charged by the government, and although

 3    part of the cross-examination at the first trial, and I

 4    anticipate at the current trial, will be that they were sort

 5    of singing for their supper, that they were the typical

 6    government cooperators who were trying to finger Mr. Wolff

 7    and to link him into this case because it's for their

 8    benefit.  What they didn't do, Your Honor, is they did

 9    not -- Homestore executives, from the CEO and CFO, down to

10    the line accountants, they did not implicate Pricewaterhouse

11    as knowing what the roundtrip deals were about.

12              THE COURT:  Giesecke, Tafeen, is that the right

13    name?

14              MR. WILNER:  Yes, Your Honor.

15              THE COURT:  Peter Tafeen.  I can't remember the

16    names of all of them, but --

17              MR. WILNER:  Joe Shew.

18              THE COURT:  Joe Shew.  Okay.

19              MR. WILNER:  They -- one could say, Your Honor, as

20    a cooperator who was looking for a 5k from the government,

21    you could say that it would be in their personal interest to

22    identify as many high-profile targets as they could and a

23    Pricewaterhouse partner with the firm itself as being

24    involved in the scheme.  If one was to be skeptical, Your

25    Honor, one could say that it was in their personal interest
```

```
 1   to come up with testimony like that.  They did not,
 2   Your Honor; and, in fact, the testimony is the opposite,
 3   that one of the techniques at the core of this case -- the
 4   core of this case, Your Honor, is misleading investors, is
 5   putting out false financial statements and duping the market
 6   into believing that Homestore was a viable business.
 7                One technique that was used was to lie to
 8   Pricewaterhouse.  And the people who are at the center of
 9   the scheme -- Giesecke, Shew, and Tafeen, Your Honor, as you
10   pointed out, had lower-level finance people and business
11   people say that in furtherance of that technique, they
12   created false documents; they gave false information to
13   Pricewaterhouse, and that is what the government --
14                THE COURT:  Is that like Thomas Vo --
15                MR. WILNER:  Yes, Your Honor.
16                THE COURT:  And the woman that did the
17   spreadsheet?
18                MR. WILNER:  Ms. Losh, Your Honor?
19                THE COURT:  Losh, right.
20                MR. WILNER:  Yes.  She didn't -- to be clear,
21   those two people that Your Honor just identified were on the
22   business side of Homestore, not the finance side, so I don't
23   believe that they physically got into a room with the
24   accountants --
25                THE COURT:  Right.
```

```
 1              MR. WILNER:  Their job, Your Honor, was to
 2    structure the deals and generate the paperwork such that
 3    when the finance people sat down, the finance people could,
 4    with a straight face, tell the people at Pricewaterhouse --
 5    well, conceal from the people at Pricewaterhouse.
 6              THE COURT:  So that it was, as I recall, then,
 7    factually, in terms of sequence, the business people were
 8    identified very early on; I think they were in the December
 9    2001 recommendation for discipline that Cahill Gordon had
10    sent to the audit committee; is that right?
11              MR. WILNER:  There were business people on that
12    list, Your Honor; yes, Your Honor, that's right.
13              THE COURT:  Do you agree with Mr. Gibbons when
14    Mr. Gibbons says there's no question that workpapers, notes,
15    and other materials were modified and/or created out of
16    whole cloth in late 2001 as this whole thing was unraveling
17    and becoming a matter of public knowledge?
18              MR. WILNER:  I want to give the Court a direct
19    answer, and I think that there are a lot of different issues
20    in there, Your Honor.  As I understand what these
21    accountants did -- as I said, they start from the premise
22    that they sat in a room with the Homestore people and were
23    given certain information that later turned out to be not
24    correct.  Some of these were junior-level people -- 24-,
25    25-, 26-year-old staff accountants at Pricewaterhouse --
```

```
 1   they admit now, when they're presented with the e-mails and
 2   the paperwork -- and these are people who have lots of
 3   different representations -- they work on the Homestore
 4   account and, then, other accounts -- they now say:  "Yeah,
 5   looks like we continued to do work.  We continued to write
 6   up what we had done."  They're accountants, not attorneys.
 7           What came through, though, Your Honor, in the
 8   re-interviews, is that's not nefarious.  I understand what
 9   the defense is doing here, and knowing about an
10   investigation started up and this process, you know, if
11   people were kicking over stones -- and it does not look
12   great, Your Honor; and I think that's why I'm standing here
13   today, but what the people say -- and they can be
14   cross-examined at trial, Your Honor, on this -- is we had an
15   obligation to continue doing this work.
16           And the accountants, although they do work in
17   anticipation of a quarterly report coming out, what
18   Pricewaterhouse is really retained to do is to provide an
19   annual audit at the end of the year, to write an opinion
20   letter that is submitted with the company's 10-K well into
21   the next business year.  The accountants said that based on
22   the procedures at that time, in late 2001, there is nothing
23   nefarious about continuing to put their workpapers together;
24   that is, it's not necessarily in a file drawer labeled
25   "quarterly review," which must be shut 45 days after the end
```

1   of the quarter; they view it as the drawer for the annual

2   audit, and that they were just continuing to do work long

3   before a deadline passed.

4          I recognize, Your Honor, and I stand here

5   understanding that it doesn't look great for the

6   Pricewaterhouse people to continue to be typing in November

7   and December on a workpaper that's going to be talking about

8   transactions that occurred in the second quarter, which

9   ended in June.

10          THE COURT:  And I take it that's why you decided

11   that, in terms of efficiency for the presentation of your

12   case, you're not going to pursue those claims?

13          MR. WILNER:  That's correct, Your Honor.

14          THE COURT:  Does this create -- there was a

15   suggestion that this creates a Bakshinian situation, and I

16   had some doubts about that, but Mr. Gibbons said he thought,

17   well, maybe -- he wasn't so sure.

18          What is your take on that?

19          MR. WILNER:  The government's take, the

20   government's theory, and the government's evidence does not

21   change, Your Honor.  There are two things that the

22   government will prove:  That there was a plot at Homestore

23   to engage in financial fraud, and that Dr. Wolff was a part

24   of that plot.

25          We had voluntarily decided not to present as much

```
 1   evidence of that by not calling the Pricewaterhouse -- we
 2   only called one Pricewaterhouse witness in the first trial;
 3   he won't be in your courtroom in the government's case, but
 4   if we're going to go forward with less evidence on the same
 5   theory, on the same argument, the same charges, that's not
 6   inconsistent, that's now just governed by Rule 29, whether
 7   it's sufficient.  Whether, as the Court pointed out, the
 8   testimony of the conspirators linking Wolff to the scheme
 9   and describing the scheme is sufficient.  Whether the
10   paperwork of the transactions themselves, which is really
11   not at issue -- the contracts between the parties, the flow
12   of funds -- there's no dispute about how the money moved,
13   about what people were doing; and we can call all the
14   Homestore witnesses, all the witnesses from the vendors,
15   from the outside companies, to establish what the scheme
16   was.
17           The scheme is crystal clear.  And the scheme on
18   its face, Your Honor, if I were to sit here and draw this
19   triangle that is in the footnote to our papers, that
20   triangle is there, and the only common sense and criminal
21   explanation for this is that it was intended to route money
22   in a way that Pricewaterhouse wouldn't see.
23           And the third major fact, which we brought up in
24   the first trial, and we will bring up again is that --
25   Your Honor is correct, they're casting doubt as to whether
```

1    Pricewaterhouse is involved in this scheme and then decided

2    to cover it up.  Pricewaterhouse lanced the boil and started

3    this thing by challenging and requiring additional paperwork

4    and documentation.  And one of the foundational transactions

5    here, the transaction involving L90 --

6              THE COURT:  L90.  Well, that's the reason why I

7    asked for the many category -- or gone report is because I

8    wanted to read the whole thing.

9              By the way, I didn't read your five pages.

10             Mr. Gibbons, you complained that he put five pages

11   on there.  I didn't read it because I didn't want it.  I

12   didn't ask for it, and I didn't know what it says, but I did

13   want to read the report because I had the sense that there

14   was a substantial amount of information, which was known

15   very early on and which caused this entire series of

16   transactions to be disclosed, and that Cahill Gordon knew

17   that from information which was provided by Pricewaterhouse.

18             MR. WILNER:  Provided by Pricewaterhouse,

19   Your Honor, and located because of Pricewaterhouse.  The

20   Pricewaterhouse staff saw some of the transactions, saw a

21   large amount of advertising sales that seemed anomalous and

22   decided to get information not from the Homestore people but

23   by sending this confirmation letter to L90.  And that put

24   the L 90 person on the spot; that triggered, as the Court

25   may now know, a late-night phone call where he demanded a

1   payment from Homestore.

2          The L90 executive has been prosecuted, convicted,

3   served prison time, and he's on the government's witness

4   list because he can testify about all this, Your Honor; that

5   when he got the Pricewaterhouse confirmation, that it

6   started a lot of things in motion.

7          So that's why the government's case has not

8   changed, Your Honor; and that's why these allegations about

9   Pricewaterhouse, Pricewaterhouse documentation, it's on the

10   periphery of everything, and for the Court to take it up at

11   the time when the Court will have extensive, powerful

12   evidence about the reality in the center of this case, I

13   think, is important.

14          I did take very seriously the information that

15   Mr. Gibbons provided.  We did spend a great deal of time

16   over the summer taking in information, hearing what they had

17   done with the electronic evidence; and he sent over a great

18   deal of it, and some of it had immediate impact on me,

19   Your Honor.  This information about the assets at issue here

20   and the modifications of those workpapers, I absolutely

21   understood.

22          I tell Your Honor, as I stand here today, these

23   allegations about the 2,000 transactions, I still don't

24   actually quite understand.  He's accusing us of a ***Brady***

25   violation and misconduct by failing to investigate something

1    having to do with workpapers for transactions in 2000.

2    Your Honor, I brought the indictment to court today.  There

3    are no transactions from 2000 in this case.  The defense has

4    a complicated theory that the 2000 transactions, the things

5    that happened long before this conspiracy started, are

6    relevant.  We did have to put on some testimony in the first

7    trial to deal with it, and to refute it, and to say there

8    were earlier transactions, but when this scheme got going,

9    it was bounded -- it was bounded and started in March of

10   2001, when certain events came into play, and continued

11   through the end of the year until all the defendants left

12   the company; but I still don't understand what earlier

13   transactions involving Pricewaterhouse have to do with

14   anything here.  I don't know whether it would be relevant to

15   hear about Pricewaterhouse audits of other companies.  It's

16   all -- it's all distracting, Your Honor, from my

17   perspective; and I can't investigate what I don't

18   understand, and that's the issue with the 2000 transactions.

19   I just don't get it.

20            THE COURT:  All right.  Let me give Mr. Gibbons a

21   chance to make some final comments, and then I'll take the

22   matter under submission.

23            Mr. Gibbons.

24            MR. GIBBONS:  Thank you, Your Honor.

25            Your Honor, let me start with what I think is the

1    most important issue, and that's when the government said

2    that in 2005, a warehouse in Washington D.C., at the

3    headquarters of the SEC, were made available to the defense

4    and the lawyers and all of this electronic material was made

5    available.  That is flatly, factually wrong.  And it's very,

6    very important that the Court understand that fact.

7         You have before you, as Exhibit 17 in our original

8    motion, an e-mail from the government to prior defense

9    counsel dated August 18, 2008, that talks about this very

10   issue of the electronic production and explaining the

11   government's position in 2008 that the electronic versions

12   of the workpapers were not made available to the defense

13   because there had been a prior claim of privilege made by

14   PwC in 2002.

15        We have also heard that the government now admits

16   no one looked at those electronic versions of the material,

17   which is exactly the issue I'm contending needed to be

18   looked at in 2002.  The red flags were abounding.  The

19   alarms were going off.  Anyone who could have even see the

20   paper version would have seen all of these last, modified

21   dates of workpapers dated on the weekend of December 8th and

22   9th of 2001.

23        I'm not trying to stand here as a former

24   prosecutor and saying how one would have done the job

25   better.  I'm saying it was available to the government and,

1   factually, it was not made available to the defense.

2   Mr. Wolff went through a trial without having the benefit of

3   the most exculpatory evidence in the case.  That being the

4   electronic workpapers.  I'm not sure I heard the government

5   answer the question as to whether they were doctored or not.

6   I suggest there is no doubt that they were, but if there is

7   any waffling on that, that is what an evidentiary hearing

8   can clear up because they were doctored.  Series of them,

9   hundreds of them, all the way back to 2000.  And the excuse

10  they gave to the government, excuse PwC gave to the

11  government, was they were within their bounds to modify

12  workpapers, continue to add on to workpapers throughout 2001

13  because they were getting to the end-of-the-year audit.

14  Well, that might work.  I challenge it.  And I know it

15  bothers Mr. Wilner, but it doesn't work at all for 2000.

16  The 2000 audit had been long completed.  Those files had

17  been archived.  That year was done.

18         And what that tells you is, when they went back,

19  in a very self-serving way, knowing what people were now

20  starting to look like -- look at -- and Richard Withey

21  testified in the first trial that he knew the SEC was coming

22  in.  He knew people were going to look at what happened

23  here.  Did he have the intent to frame my client?  No.  But

24  did it have that effect?  When you doctor hundreds of your

25  workpapers, and you eviscerate what that evidentiary record

```
 1   looks like, and then you say:  Well, go ahead and defend a

 2   lying-to-the-auditor case.  Without having any undoctored

 3   workpapers, you're defenseless.  You're defenseless on this

 4   side of the table.  And that was known to the government or

 5   should have been known to the government -- and I use the

 6   word strongly -- should have been known to the government --

 7   in 2002 if they had looked at the electronic workpapers,

 8   which were not made available to the defense.

 9            THE COURT:  When you say "government," do you mean

10   SEC?

11            MR. GIBBONS:  Well, at the time it was the SEC.

12            I know Mr. Wilner moved from the SEC to the U.S.

13   Attorney's.  I know he had been involved in this case right

14   from the get-go in 2002.  I don't know the time of the

15   transfer, but the government is the government here.  And

16   they've worked together on this case -- the SEC, U.S.

17   Attorney's Office, FBI.  The government knew or should have

18   known.

19            THE COURT:  And the doctoring of the workpapers is

20   exculpatory because it eliminates corroboration of other

21   insiders who were testifying against Mr. Wolff?

22            MR. GIBBONS:  We give you the John Giesecke

23   example in the brief, Your Honor; and I will try to recount

24   it from memory, but basically what it is Mr. Giesecke

25   testified, as did Mr. Withey -- this is a Homestore
```

1   executive, who testified that he had a long career at PwC;

2   and that when he went over to the Homestore side in the

3   accounting world -- he was the CFO and then the COO -- he

4   and the team -- the executive team -- always signed, always

5   signed, these management rep letters prior to the 10-Q

6   getting filed.  That was the testimony.  That was the basis

7   for substantive counts in the indictment.

8           When we got the electronic versions of the

9   workpapers, what did we find?  We found evidence that they

10  did not have -- did not have signed copies of the management

11  rep letters prior to the 10-Q getting filed in the second

12  and third quarter.  That evidence was not given to the

13  defense early on.  I don't know what else is missing.  I

14  haven't had a chance to have this hearing, but there's

15  evidence like that that we only got in 2009.

16          There are other examples, Your Honor, with

17  Exhibit 710 and 711.  These are management records that

18  there was no relationship between the parties.  It's the

19  core of the case.

20          Did the executive team lie to PwC about that or

21  not is going to be a critical issue in the case.  Undoctored

22  workpapers would stand for the proposition that no reps like

23  that were made.  It would completely undercut and eviscerate

24  the witnesses who are going to take the stand, but we don't

25  have undoctored workpapers.  They're gone.  Hundreds of them

1   were doctored.  And did the government know about it or

2   should they have known about it?  Absolutely.  Absolutely.

3           I don't want to belabor the point.  I would like

4   to make some other points.

5           THE COURT:  Briefly.  Quickly, please.

6           MR. GIBBONS:  I think it's important, when we try

7   to put this into context of PwC's action -- the claim was

8   that nothing nefarious went on, nothing nefarious went on.

9   And the support for that was the October 2009 interviews

10  that the government did with the four PwC witnesses.  We

11  have a whole reply brief that is dedicated to that.  The

12  excuses they gave to the government, in October of 2009, are

13  more easily proven as lies than the story they told under

14  oath at the first trial; that they didn't touch a workpaper;

15  that they gave explicit instructions to the audit team not

16  to touch a workpaper.  Then, when we discovered they had

17  touched them -- not just some, hundreds of them -- they no

18  longer tried to defend that position.  They say, well, we

19  are justified in doing that because we were getting to the

20  next year's audit.  Nothing nefarious going on because they

21  didn't know what to modify if they had been so inclined to

22  do so.  If you look at the notes we attached as exhibits of

23  those PwC audit team members, you will see triangles and

24  triangles and triangles throughout their notes.  They had

25  gotten the Losh spreadsheets on December the 6th.  It was

1    hurried in to Richard Withey over at Homestore conducting an

2    interview of Joe Shew.  December the 6th.  When Mr. Withey

3    had suggested to the government he was in London taking care

4    of a sick family member, he wasn't.  He had the Losh

5    spreadsheets, which outlined all three legs of the triangle.

6    The core of the indictment is contained in the Losh

7    spreadsheets.  Withey knew it, the PwC team knew it.  And

8    what did they do within days of getting the Losh

9    spreadsheets?  They had a modification party on the weekend

10   of December 8th and 9th.

11        Withey was interviewed.  Withey got the Losh

12   spreadsheets on December the 6th.  He's interviewing Shew,

13   and they're modifying hundreds of workpapers on the weekend.

14   Nobody's challenged that.  The government accepted those

15   excuses, that they did not know what to modify because they

16   were ignorant of the investigation in December of 2001.

17   That is a flat-out lie.  And the government had that

18   evidence to challenge that.

19        And I suggest, under **Hanna** and all of the **Brady**

20   cases out of this circuit, when you have bells and whistles

21   going off, when you have a reasonable suspicion that perjury

22   has occurred in the first trial, that the lies that are

23   being made to you to cover up that original perjury, you

24   have to ask the hard questions.  That's a duty and

25   obligation of the government to ferret out what might be

1    exculpatory material, to ferret out what might be impeaching

2    material.  And we're here to ask the Court to just give us

3    the light of day.  *Hanna* says have an evidentiary hearing

4    where all the facts come out; that's all we're asking for is

5    the ability to just understand all of the facts.  That's all

6    we want, Your Honor.  Thank you, Your Honor.

7          THE COURT:  All right.  Thank you, Mr. Gibbons.

8          Mr. Wilner, you have two minutes if you want to

9    use them.  Up to you.

10         MR. WILNER:  I think most of what I intend would

11   be at trial.  The only issue I would bring -- and I hate to

12   bring the Court into the weeds; I know you have a calendar

13   today.  Mr. Gibbons basically just accused John Giesecke of

14   perjury at the trial last time by saying, "I put pen to

15   paper on management representation letters that were sent to

16   Pricewaterhouse."  If that's true, Your Honor, then

17   Stuart Wolff did the same thing.  I have testimony, excerpt

18   about -- during cross-examination in the first trial Wolff

19   was asked the same direct question that Giesecke was:  "Did

20   you sign management representation letters for the first and

21   second quarters?"

22         And Dr. Wolff's testimony -- this was a hearing

23   for the trial, June 16th, 2006, on Page 107.  He was asked

24   about signing management representation letters for the

25   first and second quarter.  That clearly.  His answer was:

1    "I believe that's the case, yes."

2            We're now fighting about pieces of paper that show

3    what other pieces of paper may or may not have said.  He's

4    hinging his whole argument, his whole position in federal

5    court on a couple of e-mails from lower-level

6    Pricewaterhouse people that said that whatever these letters

7    were, she couldn't find them in the file; and from that they

8    bootstrap forgery, false statements, perjury, whatever.

9            Wolff testified that he signed these letters in

10   the first and second quarters, and there was no hiding of

11   the ball for the third quarter.  The indictment and the

12   workpapers themselves show that for the third quarter this

13   management representation letter was not signed, pen did not

14   hit paper, but it was a verbal authorization from company

15   management to Pricewaterhouse.  This was just a trigger

16   event to enable the quarterly report to be filed with the

17   SEC, Your Honor.  And so they're taking these grains from

18   the workpapers, from the e-mails, all the time and money

19   they spent on it, and they're blowing it out of proportion.

20   If the Court were inclined to take up this matter,

21   Your Honor, and the Court is inclined to do it, at trial,

22   after the Court has heard all of the evidence and can

23   determine whatever relevance or materiality there may or may

24   not be from this issue, that seems appropriate.

25            Your Honor had told us at our last hearing that

1    this case needs to get tried.  We set a trial date at the

2    end of January.  We've been diligently preparing for it,

3    Your Honor.  We've been flying witnesses in.  We're ready to

4    go to trial with the evidence that we have, and that's what

5    we'd like to do.

6              THE COURT:  All right.  This matter will be taken

7    under submission.  I will issue a written ruling, but it

8    will be brief.  I have a whole lot on my plate right now,

9    but I will put something in writing resolving the dispute,

10   and we'll move forward.

11             All right.  Thank you, counsel.

12             MR. WILNER:  Thank you, Your Honor.

13    *(At 10:44 a.m., proceedings were adjourned.)*

14

15                         -oOo-

16

17

18

19

20

21

22

23

24

25

1

2                              *CERTIFICATE*

3

4          *I hereby certify that pursuant to Section 753,*

5    *Title 28, United States Code, the foregoing is a true and*

6    *correct transcript of the stenographically reported*

7    *proceedings held in the above-entitled matter and that the*

8    *transcript format is in conformance with the regulations of*

9    *the Judicial Conference of the United States.*

10

11   *Date:  December 28, 2009*

12

13

14          _____

15          *LISA M. GONZALEZ, U.S. COURT REPORTER*
            *CSR NO. 5920*

16

17

18

19

20

21

22

23

24

25