ANDRÉ BIROTTE JR.
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
MICHAEL J. RAPHAEL (Cal. Bar # 208232)
Assistant United States Attorney
Chief, Appeals Section
MICHAEL R. WILNER (Cal. Bar # 156592)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3391/0687
     Facsimile: (213) 894-6269
     E-mail:   michael.raphael@usdoj.gov
               michael.wilner@usdoj.gov
Attorneys for Plaintiff
United States of America


                  UNITED STATES DISTRICT COURT

            FOR THE CENTRAL DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,        ) No. CR 05-398-GAF
                                 )
          Plaintiff,             ) **GOVERNMENT'S SENTENCING**
                                 ) **MEMORANDUM REGARDING DEFENDANT**
          v.                     ) **STUART WOLFF; APPENDIX OF**
                                 ) **SENTENCING LOSS CALCULATIONS**
STUART H. WOLFF,                 ) **AND SUPPORTING MATERIALS**
                                 )
          Defendant.             )
                                 ) Sentencing Date: April 19, 2010
                                 ) Time: 1:30 p.m.
                                 )
_____

*
*
*
*
*
*
*
*

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   The Fraudulent Roundtrip Deals Inflated
        Homestore's Reported Financial Results . . . . . . . 4

    B.   Wolff's Participation in the Scheme . . . . . . . . 6

    C.   Impact of the Disclosure of the Homestore Fraud . . . 7

III.  ADVISORY GUIDELINE CALCULATION . . . . . . . . . . . . 9

    A.   Base Offense and Loss Enhancement . . . . . . . . . 10

    B.   Additional Enhancements . . . . . . . . . . . . . . 12

    C.   Lack of Acceptance of Responsibilty . . . . . . . . 13

    D.   Final Offense Calculation and Sentencing Range . . 15

IV.   GOVERNMENT'S ANALYSIS OF SENTENCING FACTORS AND
     SENTENCING RECOMMENDATION . . . . . . . . . . . . . 15

    A.   The Section 3553(a) Factors . . . . . . . . . . . . 16

    B.   Restitution . . . . . . . . . . . . . . . . . . . . 20

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 22

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

1

## TABLE OF AUTHORITIES

**PAGE(S)**

2

**FEDERAL CASES**

3

Dura Pharmaceuticals, Inc. v. Broudo,
    544 U.S. 336 (2005)  . . . . . . . . . . . . . . . . .  10

4

5

United States v. Berger,
    587 F.3d 1038 (9th Cir. 2009)
    (pet. for reh'g filed, Jan. 12, 2010)  . . . . .  10, 23

6

7

United States v. Bakhit,
    218 F. Supp. 2d 1232 (C.D. Cal. 2002)  . . . . . .  11, 23

8

United States v. Catoggio,
    326 F.3d 323 (2d Cir. 2003)  . . . . . . . . . . . .  21

9

10

United States v. Contreras,
    581 F.3d 1163 (9th Cir. 2009)  . . . . . . . . . . .  13

11

United States v. Cummings,
    189 F. Supp. 2d 67 (S.D.N.Y. 2002)  . . . . . . . . .  21

12

13

United States v. Frith,
    461 F.3d 914 (7th Cir. 2006)  . . . . . . . . . . . .  21

14

United States v. Grabske,
    260 F. Supp. 2d 866 (N.D. Cal. 2002)  . . . . . . . .  11

15

16

United States v. Snyder,
    291 F.3d 1291 (11th Cir. 2002)  . . . . . . . . . . .  11

17

United States v. Zolp,
    479 F.3d 715 (9th Cir. 2007)  . . . . . . . . . . . .  23

18

19

20

**FEDERAL STATUTES**

21

18 U.S.C. § 371  . . . . . . . . . . . . . . . . . . . . .  1

22

18 U.S.C. § 3553(a)  . . . . . . . . . . . . . . . . .  15-19

23

18 U.S.C. § 3663(a)  . . . . . . . . . . . . . . . . . .  20

24

18 U.S.C. § 3663A  . . . . . . . . . . . . . . . . . . .  20

25

26

27

28

ii

**TABLE OF AUTHORITIES**

**PAGE(S)**

**SENTENCING GUIDELINES**

USSG § 2F1.1(a) . . . . . . . . . . . . . . . . . . . . . 9, 28

USSG § 2F1.1(b)(1)(S) . . . . . . . . . . . . . . . . . . 9

USSG § 2F1.1(b)(2)(A) . . . . . . . . . . . . . . . . . . 12

USSG § 3B1.1(a) . . . . . . . . . . . . . . . . . . . . . 12

USSG § 3B1.3 . . . . . . . . . . . . . . . . . . . . . 12

USSG § 3E1.1(a) . . . . . . . . . . . . . . . . . . . . 13-14

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Stuart Wolff awaits sentencing following his guilty plea to a charge of criminal conspiracy [18 U.S.C. § 371].

Shortly before the scheduled retrial of this corporate fraud case, the parties entered into a plea agreement to resolve the matter.  The proposed binding plea agreement -- which the Court noted at the plea hearing that it intended to enforce -- will result in a sentence within a range of 36 to 60 months for Wolff. The presentence report determined that Wolff's advisory guideline sentencing range far exceeds the statutory maximum sentence, which becomes the guideline sentence.  The Probation Officer's disclosed recommendation to the Court is for Wolff to serve a term of 60 months in custody.

The government agrees.  Wolff was the Chief Executive Officer of a thriving, dynamic, public corporation that employed thousands of employees.  Homestore.com was viewed as a successful Internet-oriented company with a bright future.  However, in early 2001, Wolff and his key colleagues at Homestore made a disastrous decision.  They decided to falsify the company's financial results so that Homestore could continue to reach ever-higher revenue goals that Wolff set.  In doing so, Wolff caused untold injury to his employees, investors, and others around him.

Specifically, Wolff and his co-conspirators forced numerous subordinates to turn away from legitimate business and, instead, deliberately implement fraudulent deals with complicit partners. Many of these individuals were prosecuted criminally, were sued

by the SEC for their misconduct, lost professional licenses, or otherwise had their careers tainted by the Homestore accounting fraud scandal.  Several members of Homestore's management team served prison terms for their federal felony convictions.

Wolff's actions also wiped out vast amounts of investor equity.  During the course of the revenue inflation scheme -- and as a result of the bogus financial reports that Wolff authorized -- Homestore was worth several billion to its shareholders.  When the truth of the company's fraud came to light, though, the value of Homestore slid to a small fraction of that amount, causing the company to barely avoid bankruptcy.  The market's condemnation of Homestore's misconduct was swift and fierce.

* * *

Wolff's involvement in the scheme was clear.  Wolff was a hands-on, brilliant executive who participated in all major (and many minor) corporate decisions for Homestore.  In the course of pretrial proceedings, this Court heard compelling proof that Wolff knowingly approved the roundtrip deal scheme at its inception.  He also facilitated implementation of the scheme by: approving huge cash transfers for the deals; assisting in the collection of fraudulent revenue from business partners; and publicizing Homestore's fabricated financial results to investors.  Throughout this process, Wolff had numerous handwringing discussions about the plot with his key managers. Despite misgivings expressed by all participants about the

significance of their actions, Wolff instructed his employees to continue with the wrongful deals.

The government acknowledges that Wolff did not conceive of the revenue inflation scheme alone, nor was he involved in all aspects of its day-to-day execution. His role was more serious than that; Wolff put the plan into motion and refused to stop it. Along the way, Wolff profited personally by selling millions of dollars of stock at inflated prices when he knew Homestore was deceiving the market about its financial results.

* * *

By the time of the original trial in this matter, all other Homestore executives and employees had accepted responsibility for their actions. Wolff was the lone holdout. During the five-year process leading up to his guilty plea, an array of cooperating witnesses testified against Wolff at the original trial, and the government and the courts spent considerable resources on his case. Finally, on the eve of retrial, Wolff grudgingly pled guilty. The sentence imposed by this Court should reflect the seriousness of Wolff's role in the Homestore debacle. The Court should also consider the contrast between Wolff and the numerous individuals who stepped forward far earlier than he did. Finally, the traditional sentencing factors regarding deterrence and punishment weigh heavily against a privileged offender who refused to play by the rules of corporate governance.

3

The government respectfully requests that the Court impose a maximum sentence of 60 months in custody for CEO Wolff.  Such a sentence is justified by the advisory guidelines, the facts of the offense, and the societal significance of the misconduct at issue here.  Wolff should also be ordered to pay restitution in the amount of the stock sale profits he took during the course of the accounting fraud scheme.

## II.  **FACTS**

The government concurs with the statement of facts contained in the presentence report.  The Court gained great familiarity with the case during recent motion practice and through its review of the government's previous evidentiary submissions.  As a result, the government provides a brief summary of Wolff's offense conduct here.[1]

### A.  **The Fraudulent Roundtrip Deals Inflated Homestore's Reported Financial Results**

Wolff was the CEO, Chairman, and founder of Homestore. Homestore's main business was to display residential real estate listings to consumers on the Internet.  A significant portion of Homestore's revenue came through sales of online advertising appearing on the websites.  Homestore reported revenue exceeding $100 million per quarter during 2001.  The common stock of Homestore was traded on the Nasdaq National Market.  PSR at ¶¶ 16, 19.

---

[1]   In its December 2009 ruling, the Court set forth a detailed analysis of the facts and evidence in the case.

During the first three fiscal quarters of 2001, Wolff and other senior Homestore executives engaged in a scheme to inflate the company's revenue through fraudulent transactions, and then to lie to the company's investors about the deals. By falsely increasing its revenue figures, Homestore was able to exceed Wall Street analysts' financial expectations for the company, thereby boosting the company's stock price. PSR at ¶¶ 30-34.

Homestore inflated its revenue by entering into numerous collusive three-way, or "roundtrip," transactions. The deals were designed solely for the purpose of creating advertising sales revenue -- essentially paying vendors money that would return to Homestore and appear as legitimate revenue. Homestore employees set up the transactions using the three-legged structure to avoid detection of the deals' true nature by the company's auditors. Homestore improperly recorded over $60 million in phony revenue from fraudulent transactions during the first three quarters of 2001. That sum was material to investors and analysts who covered Homestore and its stock's performance. PSR at ¶¶ 60, 67.

In the roundtrip deals, Homestore paid millions of dollars to vendors to buy products and services that Homestore did not need or never used. The sole reason for paying for the products was to start a flow of funds that would improperly return to Homestore as revenue. Homestore recorded considerably less in phony revenue than the real cost the company incurred in setting up the roundtrip deals. This caused Homestore to lose millions of dollars in cash in the non-economic deals. Furthermore, the

5

fraudulent transactions required the use of numerous deceptive tactics to conceal their true, circular nature.  Those tactics included altering contract dates, falsifying valuations of useless products bought from vendors, omitting key terms of the deals from the purchase contracts, and directly lying to the company's auditors about the fundamental terms of the deals and the accuracy of Homestore's financial statements.

**B.**  **Wolff's Participation in the Scheme**

Wolff closely controlled Homestore with a core group of three other executives.  Those three executives -- former Executive Vice President Peter Tafeen, former Chief Financial Officer Joseph Shew, and former Chief Operating Officer John Giesecke -- all testified against Wolff at the original trial and all served time in federal prison for their offenses.

Each co-conspirator established that Wolff knew about the fraudulent deals and approved their implementation.  The co-conspirators explained that Wolff participated in individual and group meetings regarding the fraudulent roundtrip deals. Those included candid (and sometimes emotional) discussions about the wrongful nature of the deals.  The testimony of the key managers was corroborated by: additional documentary evidence such as contemporaneous e-mails, financial reports, signed wire transfer authorizations; testimony from non-Homestore witnesses; and audiorecordings of Wolff falsely describing Homestore's financial results to investors.  PSR at ¶ 68.a.

Wolff was well aware of the significance of his public remarks about Homestore's financial performance.  Wolff is an

individual of great intelligence and sophistication.  PSR at
¶¶ 139-41.  Moreover, Wolff was a micromanager who closely
monitored virtually all aspects of Homestore's business
operations, including the roundtrip deals.

At no time, however, did Wolff disclose to investors or in
the SEC filings the fact that Homestore paid itself in sham
transactions in order to claim enough revenue to meet investor
expectations.  That information was deliberately withheld from
investors.

Finally, Wolff sold a tremendous amount of stock during the
period of the fraud.  On five occasions during 2001, Wolff sold
Homestore stock for a profit of over $8.6 million.  PSR at ¶ 77.
These sales occurred during "trading windows" following Wolff's
announcements of fraudulently inflated financial results for the
company.

**C.   Impact of the Disclosure of the Homestore Fraud**

The company disclosed the existence of the accounting
scandal at Homestore in late December 2001.  By that time,
Homestore's stock price had plummeted from previous highs due to
the company's announcement of poor (yet inflated) financial
results following the end of the third quarter of 2001.  The
revelation of bogus accounting at Homestore caused a formal
suspension of trading of the company's stock on Nasdaq.  When
trading resumed in the spring of 2002 after the company vastly
restated its financial results, the stock price traded at levels
far below pre-disclosure levels.  PSR at ¶¶ 62-67.  As explained

7

in greater detail below, over $1 billion in shareholder equity disappeared during the course of the fraud scheme.

The fraud caused other serious effects on the company and its personnel.  Wolff and senior staffmembers resigned, were suspended, or were fired for their roles in the scheme. Homestore had great difficulty in locating a new management team, especially given that the company was in the process of conducting a massive internal investigation, dealing with federal law enforcement, and responding to serious and costly civil litigation.  The company was also saddled with paying hefty legal fees on behalf of Wolff and other executives for a considerable period of time.

Additionally, the company -- which felt compelled to rename itself as "Move.com" to avoid the stigma of the revenue inflation scandal -- downsized dramatically.  The company eliminated at least 1,000 jobs in an effort to cut costs and stay out of bankruptcy.  Although still in operation, Homestore / Move has never fully recovered from the fraud.  Its stock still trades far below its price during Wolff's tenure.

The Court should also be aware of the impact that the fraud scheme had on personnel who directly participated in it. 11 individuals pled guilty in this Court (Hon. Percy Anderson) to federal criminal charges and provided substantial assistance to the government.  Three former Homestore executives were sentenced to prison terms: CFO Joe Shew served 6 months in custody; COO John Giesecke served 12 months; and Executive VP Peter Tafeen served 27 months.  The remaining criminal defendants were

Homestore sales staff and finance department employees; those individuals received probationary sentences. Moreover, the Securities and Exchange Commission brought civil enforcement actions against over two dozen parties, including many of the outside vendors involved in the corrupt deals.

### III. **ADVISORY GUIDELINE CALCULATION**

The presentence report contains a detailed calculation of Wolff's offense level under the advisory guidelines. Using the 2000 version of the guidelines (as the parties stipulated in the plea agreement), the experienced Probation Officer concludes that Wolff's offense level is 30.

The government believes that the offense level should be higher. Wolff's long-delayed guilty plea and his self-serving testimony at the original trial warrant denying him a reduction for acceptance of responsibility (although the government does not seek an enhancement for obstruction of justice due to Wolff's prior trial testimony). However, this dispute has no practical effect given that either guideline calculation will far exceed the statutory maximum. For this reason, the government respectfully asks the Court to accept the presentence report's determination that Wolff's guideline sentence is 60 months, whether or not it applies the acceptance of responsibility reduction.

### A.   __Base Offense and Loss Enhancement__

The presentence report assigns Wolff's fraud-based conspiracy a base offense level of 6.  [USSG § 2F1.1(a)].  The 2000 guidelines fraud loss table for pre-Enron offenses such as Homestore has a top-level enhancement of 18 levels for a loss exceeding $80 million.  [USSG § 2F1.1(b)(1)(S)].  The presentence report recommends the full 18-level enhancement.  PSR at ¶¶ 76, 86-88.

The Ninth Circuit recently spoke conclusively about the calculation of loss in a securities fraud case such as this.  The district court is to make a reasonable estimate of the "losses that resulted from the defendant's fraud."  __United States v. Berger__, 587 F.3d 1038, 1043 (9th Cir. 2009) (quotation omitted) (__pet. for reh'g filed__, Jan. 12, 2010).  A sentencing court need not use the civil securities fraud concept of loss causation set forth in __Dura Pharmaceuticals, Inc. v. Broudo__, 544 U.S. 336 (2005).  Rather, "where the value of securities have been inflated by a defendant's fraud," it is sufficient for the government to establish the scope of that inflation at sentencing.  __Berger__, 587 F.3d at 1044-45.  The court's estimate "should attempt to gauge the difference between [the company's] share price -- as inflated through fraudulent representation -- and what that price would have been absent the misrepresentation."  __Id.__ at 1046-47.  Where a court applies sentencing enhancements for financial loss based on a conviction for conspiracy involving a fraud scheme, the preponderance of the evidence standard applies.  __Id.__ at 1047-49.

In the present case, the Probation Officer determined that the loss here is literally off-the-chart.  The presentence report sets forth several methods by which loss can be calculated here, each of which far exceeds the $80 million top tier under the 2000 guidelines.  PSR at ¶¶ 76, 86-88.

The government agrees with these calculations, and separately sets forth its loss analysis at the Appendix to this memorandum.  The various calculations all use public data regarding Homestore's stock trading.  This information is then used to generate calculations under the "average victim loss" or "rescissory" measure of estimating loss as established in United States v. Bakhit, 218 F. Supp. 2d 1232 (C.D. Cal. 2002) (Carter, J.), United States v. Grabske, 260 F. Supp. 2d 866 (N.D. Cal. 2002), and United States v. Snyder, 291 F.3d 1291 (11th Cir. 2002).

What that loss estimation method captures is the rough amount of harm inflicted on investors.  Purchasers bought Homestore stock at varying prices during the period of time during which the company inflated its revenue.  Information was hidden from those victims; they purchased their stock at a time when they did not know about Homestore's phony accounting for the roundtrip deals.  When investors finally learned about the illegal conduct, they sold their Homestore stock during an identifiable period in which Homestore's stock price was driven far lower.

Under this analysis, defendant Wolff's loss figure is well over $1 billion.  The average loss method accurately, yet

11

conservatively, reflects the damage done to individual and institutional investors who owned Homestore stock through 2001. Homestore's overall market capitalization -- which represents the equity that shareholders owned in the corporation -- declined by several billion dollars over the course of this corporate fraud scandal.

To confirm the enormity of the loss attributable to the fraud scheme, the alternative calculations of loss in the Appendix use different relevant dates to examine the performance of Homestore's stock.  All show the undeniable inflation of the company's securities during the fraud period.

**B.  Additional Enhancements**

The presentence report also applies guideline enhancements for: more than minimal planning (two levels per USSG § 2F1.1(b)(2)(A)); aggravating role in the offense for being an organizer or leader of criminal activity with more than five participants (four levels per USSG § 3B1.1(a)); and abuse of a position of trust (two levels per USSG § 3B1.3).  PSR at ¶¶ 89-93.

The government agrees with the application of all of these enhancements.  This significant, long-running corporate fraud scheme involved numerous multi-million dollar transactions executed over the course of many months.  Considerable planning was required to implement the scheme, rendering the "more than minimal planning" enhancement appropriate.

Furthermore, Wolff was not only the CEO of Homestore, but he was the CEO of the fraud scheme.  Wolff was the direct or

12

indirect supervisor of all of the subordinate Homestore personnel who participated in the roundtrip deals and falsified Homestore's financial records.  The aggravating role enhancement is supported by the numerous felony pleas of his employees, demonstrating that they were criminal participants in the scheme rather than unknowing ones.

As to the abuse of trust enhancement, the Court needs to determine: (1) whether Wolff held a position characterized by "professional or managerial discretion"; and (2) whether the position significantly facilitated commission of the crime. United States v. Contreras, 581 F.3d 1163, 1168-69 (9th Cir. 2009).  Wolff undoubtedly meets this test.  As the CEO of the corporation, Wolff owed a fiduciary obligation to shareholders and the company's board of directors.  Even so, Wolff definitively exercised his discretion to approve and implement the roundtrip deals.  CEO Wolff then decided that Homestore would record revenue from the deals.  He also controlled how the deals would be concealed from investors and the SEC in public statements and filings, including through his own affirmative and direct misrepresentations to investors in quarterly conference calls.

### C.   **Lack of Acceptance of Responsibilty**

Finally, the presentence report deducts two levels for Wolff's acceptance of responsibility.  PSR at ¶ 97.  Given the status of the case, the government respectfully disagrees that this defendant has "clearly demonstrate[d]" acceptance of responsibility for the offense.  USSG § 3E1.1(a).

Wolff denied knowledge of the revenue inflation at Homestore for years. At his original trial, he gave testimony -- which was clearly disbelieved by the jury -- stating that he was not involved in the roundtrip deals and claiming that he did not understand the basics of the scheme.[2] He aggressively litigated the case in the district court, on appeal, and on remand to this Court. When he finally agreed to plead guilty, Wolff's eve-of-retrial plea was grudging at best.

It is by no means clear that Wolff accepts responsibility for the relevant conduct encompassed by his offense, see USSG § 3E1.1, com. n.1(a), nor anything more than the barest minimum necessary for the factual basis to his plea. To the extent that Wolff has accepted responsibility at all, his doing so was anything but timely. See USSG § 3E1.1, com. n.1(b). Without further proof of Wolff's acceptance of responsibility for the full range of his conduct, the belated, limited acceptance that he offers the Court is outweighed by his active denials of responsibility over many years. See USSG § 3E1.1, com. n.3.

In any common sense understanding of the phrase, Wolff has not accepted responsibility for his actions here. The government does not believe that Wolff is entitled to a reduction of his guideline offense level based on the mere entry of his plea.

---

[2]   At the original sentencing, the government sought an enhancement for obstruction of justice due to the false trial testimony. The Court did not add that enhancement. Still, the stark difference between Wolff's sworn repudiation of involvement in the fraud and his ultimate guilty plea demonstrates his long-term denial of responsibility.

### D.  <u>Final Offense Calculation and Sentencing Range</u>

The presentence report calculates that Wolff's final offense level is 30.  If the Court were to agree with the government on the issue of Wolff's inadequate acceptance of responsibility, the final offense level would be 32.  With a Criminal History Category of I, Wolff's guideline sentencing range would either be 97-121 months (PSR) or 121-151 (government).

Under either circumstance, though, the calculation far exceeds the statutory maximum sentence for the crime of conviction.  As a result, Wolff's guideline sentence is the same as the statutory maximum: 60 months.

## IV.  <u>GOVERNMENT'S ANALYSIS OF SENTENCING FACTORS AND SENTENCING RECOMMENDATION</u>

The government respectfully requests that the Court sentence Wolff to the statutory maximum sentence of 60 months in custody. This recommendation is consistent with the parameters of the parties' plea agreement, the extraordinary seriousness of the offense, and the sentences previously imposed on Wolff's co-conspirators.  The government further requests that Wolff be ordered to pay restitution in the amount of the profits he illegally derived from selling Homestore stock during the fraud scheme.

A.   **The Section 3553(a) Factors**

The nature and circumstances of the crime[3] justify a
considerable sentence here.  The Homestore accounting scandal was
one of the most significant corporate fraud cases in the history
of this judicial district.  The company and its management team
breached basic corporate ethics by deliberately falsifying
Homestore's financial results, which caused extraordinary harm to
many.

Throughout 2001, Wolff personally authorized the wasteful
spending of company resources in the money-losing roundtrip
deals.  At Wolff's direction, the bright staff of this dynamic,
innovative company orchestrated numerous complex transactions
involving detailed contracts, precision-timed money transfers,
and realistic (but utterly false) supporting documentation.
Wolff and Homestore compounded the fraud by blatantly lying to
shareholders, Wall Street analysts, the SEC, and the company's
Board of Directors about Homestore's hidden, faltering financial
performance.

The effectiveness of the criminal venture is clear.  For the
first and second quarters of 2001, Homestore was a darling of
Wall Street for exceeding market expectations of its revenue --
but only because of the corrupt transactions that Wolff
green-lighted.  Homestore's stock price remained high during this
period.  The company's stock was widely held by numerous
individuals, mutual funds, and pension plans.  Wolff never

---

[3]     18 U.S.C. § 3553(a)(1).

16

disclosed any aspect of the roundtrip deals to the public, not even what he formerly claimed he thought to be "legitimate" revenue coming from loyal advertising clients.  Even when Homestore announced disappointing financial results in the third quarter of 2001, the roundtrip deals executed that quarter concealed the poor state of the company's actual financial situation.

The disclosure that Homestore had cooked its books caused predictable, stunning consequences.  The company's stock was delisted to prevent public trading and further economic harm to victims.  Homestore incurred enormous costs related to its internal investigation, litigation, and the repair of its corporate image.  When the stock resumed trading, its price was a small fraction of its pre-fraud levels.  Over a billion dollars of investors' wealth was gone.  So too was investor and employee confidence in the Homestore business model, especially for those Homestore workers who lost their jobs at the suddenly struggling company.

Wolff was at the center of the criminal scheme.  Acting in concert with his top staff, this corporate CEO affirmatively decided to fabricate short-term results rather than report them accurately to the public.  Wolff approved the phony deals, facilitated the movement of funds to implement them, helped collect bogus revenue from a stubborn participant, and directly lied about the deals in written regulatory filings and market statements.  Even as he wasted tens of millions of dollars of shareholder funds on the deals, Wolff sold his stock at inflated

prices to reap huge personal profits.  The nature and circumstances of the offense weigh heavily against Wolff at sentencing here.

The sentencing factors regarding deterrence, punishment, and the seriousness of the offense[4] also merit consideration here. Southern California is home to many major, publicly traded businesses.  The nation has seen repeated corporate fraud scandals in recent years, each of which caused immeasurable damage to the economy and the community.  It is imperative that corporate executives take seriously their fiduciary obligations to shareholders and the market.  The Homestore scandal involved outrageous misconduct such as falsifying financial results and flat-out lying.  Such violative conduct should be strongly punished by a federal court to prevent and deter future crimes by other local executives.  A high-end sentence will reasonably address those sentencing goals.

The government acknowledges that Wolff's history and characteristics[5] do not suggest that he presents a danger to society beyond the facts of this case.  Wolff is a first-time offender with no criminal background.  However, through his enormous financial resources and attritional litigation strategy, Wolff delayed resolution of this case for years.  That required enormous governmental resources, including countless hours of work by the prosecutors, and an elite white-collar FBI agent

---

[4]     18 U.S.C. § 3553(a)(2)(A), (B).

[5]     18 U.S.C. § 3553(a)(1).

18

effectively being taken off the streets to work on Wolff's case. Given his extensive denials of responsibility and his obstruction of this proceeding, Wolff has demonstrated little in the way of respect for the rule of law.[6]

Finally, the Court should consider the sentences imposed on other participants in the Homestore scheme.  Nearly a dozen other Homestore executives and employees accepted responsibility for their criminal conduct years ago.  All of those individuals acknowledged their misconduct, and then made enormous efforts to repair the damage they caused.  Beginning in mid-2002, former Homestore personnel began meeting with the prosecution and FBI in order to explain how the scheme operated and who was responsible for it.  Many of those individuals testified at length at Wolff's original trial.  After demonstrating genuine contrition and making significant amends for their crimes, several served prison terms.  Unsurprisingly, the longest prison sentence (27 months) went to Wolff's main lieutenant, Peter Tafeen, who was the last individual to plead guilty before Wolff's trial.

Wolff should serve a prison term considerably longer than Tafeen.  Wolff held far greater authority at Homestore than Tafeen, and could have prevented Tafeen's criminal conduct at the outset by using that authority appropriately.  Instead, Wolff joined forces with Tafeen in the scheme.  Along the way, Wolff profited from his stock sales in an amount higher than Tafeen. Moreover, while Tafeen provide crucial, excoriating testimony

---

[6]    18 U.S.C. § 3553(a)(2)(A).

against Wolff for which he received credit at sentencing as a

cooperator, Wolff never provided such assistance against any

other party.  To the contrary, Wolff forced the government to

expend resources on this case.  Fundamental fairness, common

sense, and the statutory factor regarding unwarranted sentencing

disparities[7] lead to the conclusion that Wolff's sentence should

be much longer than those of Tafeen or the other culpable

Homestore executives, and who offered extensive testimony

implicating Wolff to substantially assist the government.

**B.**   **Restitution**

The government and the Probation Officer each recommend that

Wolff give up the illegal profits he derived from trading in

Homestore stock during the criminal conspiracy.  The Probation

Officer recommends that this disgorgement occur in the form of an

$8 million fine to the U.S. Treasury.  See Recommendation Letter

at 1, 3.  Instead, the government believes that Wolff should be

ordered to pay restitution to the civil plaintiffs in a related

civil action brought by defrauded Homestore shareholders in the

manner envisioned in the parties' plea agreement.[8]

Restitution is a mandatory part of sentencing under

18 U.S.C. § 3663A.  Restitution is also permitted under the

discretionary provision of 18 U.S.C. § 3663(a)(1)(A).  That

section permits restitution when a defendant is convicted of an

---

[7]    18 U.S.C. § 3553(a)(6).

[8]    While Wolff has not conceded that he is required to pay restitution, the parties agree that it is appropriate for such restitution to be paid the ongoing civil cases.  See Plea Agreement at ¶¶ 8, 19.

offense under Title 18 of the United States Code.  The statute expressly envisions the payment of restitution to "any person directly harmed by the defendant's criminal conduct in the course of the scheme, <u>conspiracy</u>, or pattern."  18 U.S.C. § 3663(a)(2) (emphasis added).  A defendant may be ordered to pay mandatory restitution for conspiring to commit a crime -- a violation of 18 U.S.C. § 371 -- even if the substantive offenses are violations of the securities laws codified under Title 15 rather than Title 18.  <u>See, e.g.</u>, <u>United States v. Frith</u>, 461 F.3d 914, 919 (7th Cir. 2006); <u>United States v. Cummings</u>, 189 F. Supp. 2d 67, 73 (S.D.N.Y. 2002) (former CFO ordered to pay restitution).

     It is entirely appropriate for this Court to order Wolff to pay restitution through the mechanism of the related civil lawsuits to maximize the amount of payments to victims.  <u>Cf.</u> <u>United States v. Catoggio</u>, 326 F.3d 323, 327 (2d Cir. 2003) (praising "creative approach to a difficult" restitution issue in brokerage fraud case; remanding for resentencing because restitution ordered to unidentified victims).

     In the present case, Wolff received $8,638,106 in trading profits during the course of the 2001 conspiracy.  Those profits were based on the obvious inflation of Homestore's stock price as a result of the fraudulent revenue scheme.  Wolff sold the stock at unfairly high prices -- prices paid by unwitting shareholders, to their financial detriment.  Wolff therefore caused direct financial harm to victims who are parties to the civil actions pending in this district court.  Wolff should pay them restitution in the amount of the illegal proceeds he derived from the scheme.

**V.    CONCLUSION**

The financial fraud at Homestore was of unquestioned scope and severity.  With this sentencing, all of the scheme's key players will finally have been brought to justice.  Wolff was crucial to implementing the accounting fraud plot with the other senior executives at the company.  Additionally, as CEO, Wolff was responsible for establishing a hit-the-numbers mentality at Homestore that essentially forced many lower-level employees to join in the fraud.

All of the other participants in the scheme admitted their guilt and cooperated with the government years ago.  While Wolff was capable of negotiating a resolution to this case, his admissions have been minimal, and he made no effort over the years to assist the investigation or prosecution here.  For these reasons, a significant sentence is warranted.  Pursuant to the terms of the parties' plea agreement, the government respectfully requests that the Court sentence Wolff to a prison term of 60 months, order him to pay restitution, and impose the other relief and conditions recommended by the Probation Office.

Dated: March 11, 2010          Respectfully submitted,

                               ANDRÉ BIROTTE JR.
                               United States Attorney

                               CHRISTINE C. EWELL
                               Assistant United States Attorney
                               Chief, Criminal Division

                                   /s/   AUSA Wilner
                               MICHAEL J. RAPHAEL
                               MICHAEL R. WILNER
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               United States of America

**APPENDIX**

**GOVERNMENT'S SENTENCING LOSS CALCULATIONS**

The government sets forth below its calculations of the fraud loss in this case.  The calculations use the "average price method" described in <u>Bakhit</u> and effectively endorsed in <u>Berger</u> and <u>United States v. Zolp</u>, 479 F.3d 715 (9th Cir. 2007).  The calculations are identical to those presented to the district court during Wolff's sentencing following the original trial of this case.

Only three pieces of data are necessary to calculate the loss figure under the average victim loss method:

> (1)   the average price of Homestore stock during the period of the fraud;
>
> (2)   the average price of Homestore stock in the period following disclosure of the fraud; and
>
> (3)   the number of outstanding shares of Homestore stock affected by the fraud.

The government's calculations below use this data and are supported by historic information regarding Homestore's stock trading.[9]  The calculations conclusively establish that the loss

---

[9]   The government resubmits a declaration from Mimi Le, an analyst with the NASD's Criminal Prosecution Assistance Group, to verify the sources and accuracy of these figures.  That declaration was filed in connection with Wolff's original sentencing in 2006.  Ms. Le is no longer employed at the NASD (which has now been renamed the "Financial Industry Regulatory Authority").  However, no aspect of her statement or the underlying data has changed since Wolff's first sentencing.

figure in this case is far higher than the $80 million threshhold for the highest loss enhancement under Section 2F1.1.

**1.   <u>Average Price During the Fraud</u>**

The period of time that the Homestore fraud affected the market for Homestore stock began on <u>April 26, 2001</u>,[10] and continued until <u>December 21, 2001</u>.  Following the close of trading on April 25, Homestore issued a false press release and conducted a conference call to publicize its false first quarter financial results.  Wolff personally participated in the issuance of the press release.  He also spoke at length during the conference call about the company's supposedly positive financial performance.  In both the press release and conference call, Wolff lied about Homestore artificially inflated revenue for the first quarter of 2001.  Fraudulent information first entered the market on April 26, which was the next trading day.

The period of fraudulent information ended on December 21, 2001.  On that day, Homestore issued a press release announcing that it was conducting an accounting inquiry into its previously reported financial results.  Nasdaq immediately suspended trading in Homestore stock.

Homestore stock closed at $34.00 per share on April 26 (the first day of trading after the issuance of the falsely positive financial news).  Homestore stock closed at $3.60 per share on December 21, and did not trade on the Nasdaq for several months

---

[10]   The Homestore conspiracy began in March 2001.  However, the first event in which false information was distributed to the public was in late April 2001.

24

thereafter.  During the intervening period, Homestore stock closed at a high of $36.48 per share on July 2 and at a low of $2.28 per share on November 2.[11]  The government calculates that the average daily closing price of Homestore stock was $18.13 per share during the fraud period.

**2.   Average Price Following Disclosure of the Fraud**

Nasdaq permitted Homestore to resume full trading on February 22, 2002.[12]  The company filed restated financial results for fiscal years 2000 and 2001 with the SEC in March 2002.  Homestore made no major announcements about its business operations or transactions until it issued its quarterly report for the first quarter of 2002 on May 15, 2002.  For this reason, it is appropriate to use the period from February 22 through May 15, 2002, to determine the average price of Homestore stock following the disclosure of the fraud.  The government calculates that the average daily closing price of Homestore stock was $2.02 per share during this period.[13]

---

[11]     November 2 was the day after Homestore announced poor results for the third quarter of 2001, but failed to disclose that the company had engaged in a scheme to artificially inflate its revenues during the year.

[12]     In the period between the December 2001 announcement of accounting inquiry and trading suspension and the February 2002 resumption of trading, Homestore stock traded intermittently on private (though publicly reported) electronic communications networks.

[13]     This figure and the period of time recommended by the government are the most favorable to defendant under the average victim loss method.  Homestore stock traded at well under $2.00 per share from February 22 through the end of March 2002.  Also, following the announcement of first quarter results in mid-May 2002, Homestore's stock price again dropped below $2.00 per share in June and July 2002.  Limiting the post-disclosure periods to

25

### 3.   __Number of Outstanding Shares__

According to Homestore's Form 10-Q filed with the SEC on May 15, 2001, Homestore had 107,490,834 shares of stock outstanding at the end of the first quarter of 2001.  That figure should be reduced by Wolff's own shares.  According to a proxy statement filed with the SEC in April 2001, Wolff owned 3,214,991 shares or exercisable options in Homestore stock.  By deducting Wolff's shares from this total, the government calculates that there were <u>104,275,843</u> shares of Homestore stock outstanding during the fraud period.[14]

### 4.   __Calculation of Loss__

The calculation of loss involves determining the difference between (a) the average price during the fraud and (b) the average price following disclosure of the fraud, and then multiplying this figure by the number of affected shares.  The difference between $18.13 (fraud period) and $2.02 (post-fraud period) prices is <u>$16.11</u> per share.  With 104,275,843 shares affected, the total loss is <u>__$1,679,883,831__</u>.

The government recommends that the Court use this loss figure as the basis for determining loss under the Guidelines. The irrefutable evidence shows that Homestore stock traded

_____

either March 2002 or June-July 2002 would result in a larger loss figure.

[14]   Homestore issued additional shares of stock during 2001.  According to the Form 10-Q issued in November 2001, Homestore had over 117 million shares outstanding as of the end of the fraud period.  The government recommends that the Court adopt the smaller figure of 104 million shares in existence throughout the entire fraud period.

26

between $20 and $30 per share during most of the spring and summer of 2001.  This means that investors valued Homestore as being worth several billion dollars for most of the year.  That valuation was at least partly based on Homestore's ever-growing revenue results, consistent achievement of earnings goals, and rosy public statements from Wolff and others about the state of the business.

When information about Homestore's bogus accounting practices came to light in early 2002, Homestore stock plummeted to a fraction of its earlier value.  The market completely reevaluated Homestore -- and devalued its stock -- after learning about the roundtrip deals.  The average loss method fairly and accurately captures the investor loss attributable to the revenue inflation scheme.

5.   **Alternative Loss Calculation**

In the alternative, the amount of loss attributable to defendant's crime could be calculated simply based on the decline of Homestore's stock price from the day of the public disclosure of the fraud (Dec. 21, 2001) to the day that trading resumed based on corrected information about the company (either February 22, 2002 (resumption of public trading) or April 1, 2002 (filing of restated financial statements with the SEC)).

Homestore's stock price on December 21, 2001, was $3.60 per share.  Upon resumption of trading on February 22, 2002, the stock closed at $0.85 per share.  The loss per share was therefore $2.75 per share.  The total amount of shares affected by this loss was slightly higher than under the average loss

method described above (117,463,297 shares less Wolff's 3,214,991 shares = <u>114,248,306</u> shares).  The total loss therefore would be **$314,182,842** under this method.

If the April 1 stock price of <u>$2.32</u> per share (following the filing of corrected financial statements) is used, the loss per share is <u>$1.28</u> per share.  This results in a total loss of **$146,237,832**.

The government believes that these alternative calculations lead to unfairly low and skewed loss amounts that do not capture harm caused to shareholders who bought Homestore stock during the heart of the fraud.  Nevertheless, the alternative loss calculations still exceed $80,000,000, and will result in a maximum loss enhancement under USSG § 2F1.1.