**GREENBERG TRAURIG, LLP**
John F. Gibbons *(pro hac vice)*
Daniel D. Rubinstein (Cal. Bar No. 178896)
77 West Wacker Drive
Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email:  Gibbonsj@gtlaw.com
Email:  Rubinsteindd@gtlaw.com

**GREENBERG TRAURIG, LLP**
WENDY M. MANTELL (Cal. Bar No. 225544)
2450 Colorado Avenue
Suite 400E
Santa Monica, CA 90404
Telephone:  (310) 586-7700
Facsimile:  (310) 586-7800

Attorneys for Stuart H. Wolff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR-05-398 GAF |
| Plaintiff, | **DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING** |
| vs. | |
| STUART H. WOLFF, | SENTENCING DATE:  April 19, 2010 |
| Defendant. | **<u>REDACTED VERSION</u>** |

# **TABLE OF CONTENTS**

I.      Introduction ................................................................................................ 1

II.     Sentencing After Booker ........................................................................... 1

III.    Factor One:  Circumstances of the Offense/Characteristics of
        Defendant ................................................................................................... 3

        A.      Personal Background ...................................................................... 3

        B.      Background Of The Offense ........................................................... 8

        C.      The Offense and its Aftermath ..................................................... 11

IV.     Factor Two:  Purposes of Sentencing ..................................................... 15

                1.      Retribution ......................................................................... 15

                2.      General Deterrence ............................................................ 16

                3.      Specific Deterrence ........................................................... 17

                4.      Rehabilitation .................................................................... 18

V.      Factor Three:  The Kinds of Sentences Available ................................. 18

VI.     Factors Four And Five:  The Sentencing Guidelines and Policy
        Statements ................................................................................................ 19

        A.      Average Victim Loss Theory ....................................................... 20

        B.      Market Capitalization Theory ...................................................... 23

VII.    Factor Six:  Disparity With Similar Offenders ..................................... 25

VIII.   Factor Seven:  Restitution and Fine ....................................................... 28

IX.     Post Sentencing Issues ............................................................................ 33

        A.      Medical Recommendation ............................................................ 33

        B.      Prison Facility Request ................................................................ 34

X.      Conclusion ............................................................................................... 34

1

# TABLE OF AUTHORITIES

2

**Federal Cases**

3

*Dura Pharmaceuticals v. Broudo,*
    544 U.S. 336 (2005).............................................................................21, 22
*Gall v. United States,*
    552 U.S. 38 (2007)...............................................................................2
*Kimbrough v. United States,*
    552 U.S. 85 (2007)...............................................................................2
*Rita v. United States,*
    551 U.S. 338 (2007).............................................................................2
*United States v. Adelson*
    441 F. Supp.2d 506 (S.D.N.Y 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d
    Cir. 2008) ............................................................................................16, 35
*United States v. Bakhit,*
    218 F.Supp.2d 1232 (C.D. Cal. 2002) ................................................23
*United States v. Booker,*
    543 U.S. 220 (2005).............................................................................1, 2, 18
*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) ..............................................................2
*United States v. Frith,*
    461 F.3d 914 (7th Cir. 2006)..............................................................29, 30
*United States v. Whitehead,*
    532 F.3d 991 (9th Cir. 2008) ..............................................................2

**Federal Statutes**

18 U.S.C. § 3553 .........................................................................................passim
18 U.S.C. § 3556 .........................................................................................30
18 U.S.C. § 3563 .........................................................................................30, 31
18 U.S.C. § 3572 .........................................................................................33
18 U.S.C. § 3583 .........................................................................................29, 30
18 U.S.C. § 3663 .........................................................................................29, 30
18 U.S.C. § 3664 .........................................................................................30, 32
18 U.S.C. § 371 ...........................................................................................1
U.S.S.G. § 2F1 ............................................................................................passim
U.S.S.G. § 5E1 ............................................................................................29, 30

**Other Authorities**

Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005)........................16
Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J.
    485, 492 (1998).................................................................................16

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

The Wall Street Journal, June 28, 2009, <u>Madoff's Wife Cedes Asset Claim</u> .................33

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) ..................................................................................2, 16

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

Defendant Stuart Wolff, by and through his attorneys John F. Gibbons and Daniel D. Rubinstein, respectfully submits the following Submission Concerning Sentencing.

## I.   **Introduction**

Mr. Wolff is the former Chief Executive Officer and Chairman of the Board of Directors of Homestore.com ("Homestore").  On January 7, 2010, Mr. Wolff pled guilty to count one of the Indictment, charging him with conspiracy in violation of 18 U.S.C. § 371.  He is scheduled to be sentenced on April 19, 2010.

For 46 years, Mr. Wolff has led an exemplary life--both professionally and personally.  However, for reasons that are expounded on later in this Submission, Mr. Wolff made an uncharacteristic decision in early 2001 to "green-light" the improper recording of revenue and not use his power and authority to stop it.  As the government correctly notes in their Sentencing Memorandum, this was a "disastrous decision" that caused injury to Homestore's employees, investors and others; it also had a devastating impact on all the defendants' lives, including Mr. Wolff.  He is truly sorry for his actions, takes full responsibility for his conduct, realizes and feels devastated by the harms caused, and knows that he likely will live the rest of his life making amends for his misconduct.  Mr. Wolff is prepared and accepts that he will be punished.  We respectfully file this Submission, and provide the Court with personal information about Mr. Wolff, via the attached letters of family, friends and co-workers, to put his conviction and conduct into context.  We urge the Court to review each of the letters attached hereto to gain a fuller appreciation of the true character of the person the Court will sentence on April 19, 2010.

## II.   **Sentencing After Booker**

Since *United States v. Booker*, 543 U.S. 220 (2005), rendered the United States Sentencing Guidelines (the "Guidelines") advisory, courts must determine sentences for criminal defendants by reference to the seven factors set forth in 18 U.S.C. § 3553(a).  These factors include:  (1) the nature and circumstances of the offense and the history

and characteristics of the defendant; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines calculation; (5) policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among similar defendants convicted of similar conduct, and; (7) the need to provide restitution to any victim of the offense. In *United States v. Carty*, 520 F.3d 984, 991-94 (9th Cir. 2008) (*en banc*), the Ninth Circuit described the procedures a district court must follow in imposing a sentence after the Supreme Court's decisions in *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007). The defense will not repeat all of them here as this Court is well aware of the law on this subject. We would, however, emphasize the Ninth Circuit's directive that "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary'" to meet the societal goals of punishment, deterrence, rehabilitation and productive citizenship as set forth in 18 U.S.C. § 3553(a). *Carty*, 520 F.3d at 991. In addition, "[t]he district court may not presume that the Guidelines range is reasonable," but, instead, must "make an individualized determination based on the facts." *Id.* (citations omitted). Finally, we highlight the following additional directive from the Ninth Circuit: "'One theme' runs through the Supreme Court's recent sentencing decisions: *Booker* empowered district courts, not appellate courts, and breathed life into the authority of district court judges to engage in individualized sentencing." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (affirming district court's sentence of 1,000 hours of community service, restitution and five years supervised release where the applicable guideline range was 41-51 months based upon defendant's repentance, his young daughter's dependence upon him, and the court's finding that "defendant's crime did not pose same danger to the community as many other crimes.") As further amplified below, we respectfully urge that an individualized consideration of all of the Section 3553(a) factors relating to Mr. Wolff supports the imposition of a three year sentence, along with substantial restitution.

## III.   Factor One:  Circumstances of the Offense/Characteristics of Defendant

### A.   Personal Background

Mr. Wolff is almost 47 years old and, but for his actions in 2001, has been a productive and law abiding member of our community (business, personal and philanthropic) for that entire period of time.  Mr. Wolff was born in Tulsa, Oklahoma, where he lived with both of his parents and sister before going off to college.  As the attached letters make abundantly clear, Mr. Wolff has been a selfless, honorable, honest, giving, forthright and dedicated father, spouse, sibling, friend and member of his community his entire life.  Long time friend Jenk Jones recounts:

> I have known Stuart since he was less than a year old, when his family moved in next door to us.  My son and Stuart are six days apart in age and grew up almost like brothers, sharing two homes, ours and that of the Wolff's.  As a coach and a father who played sports with all the neighborhood kids, I have worked with Stuart in baseball, basketball and soccer.  Between those sports and the countless hours he spent at our house I know him well.  I don't know the particulars of the case in question, but allegations of wrongdoing seem totally out of character for a young man who was always polite to his elders, supportive of his friends, a good student and eager to help in any worthwhile project. (Exhibit A)

Similarly, Stuart's sister, Dr. Cindy Zelby, informs:

> Stuart and I were both raised with very strong family values including respect for parents, honesty, education, caring about others, and hard work…Stuart has flaws and as his sister I would be more than happy to point them out to you in detail.  However, lying and cheating were never part of his personality.  I would know because I played countless games of Yahtzee, Scrabble, Life and Sorry with him when we were kids.  If he was going to cheat anyone it would have been me.  He never cheated one time.  He bit me and he kicked me but he never cheated. (Exhibit B)

Indeed, such a humble and caring upbringing is part of the reason that his criminal activity of 2001 is so out of character, as Mr. Wolff's father, Milt Wolff, explained in his letter to the Court:

> He has never been in trouble with any agency in his life much less the D.O.J. He is a good and kind individual and a very good father and husband. (Exhibit C)

Echoing these same character traits, Mr. Wolff's mother, Diana, states:

> Stuart has always been a good and kind man to anyone he has met in his life. He has never hurt anyone or broken the laws of the United States, his religion or our family. He has never lied, cheated or stolen anything from anyone in his life. He is a great son, brother, husband and father, full of love, caring and humor.
>
> \*       \*       \*       \*
>
> Honesty, goodness and kindness describe who Stuart Wolff is and has always been…. (Group Exhibit D)

In 1995, Mr. Wolff married his wife, Ursula Glauser, a native of Switzerland, whose entire family continues to reside there. Mr. and Mrs. Wolff have three children - - Alexander, who is 13 years old; Isabelle, who is 11 years old; and Max, who is 8 years old. When Alexander offered to write a letter to the Court undersigned counsel was hesitant to involve a minor. However, after reading the letter, it so candidly provided an insight into Mr. Wolff's character that counsel concluded it should be reviewed by the Court. Alex reflects that:

> In this letter, I hope to show you that my dad is an honest, hard working man, who always taught me and my siblings, that to, as he put it, to cut corners was unacceptable. He also taught us that honesty is one of the most vital virtues any person could possess. Finally, he has taught us that it is important to admit when you make a mistake and not try to make excuses…. He never lets us make excuses when we don't do well on tests or play well in sports games. He taught us that same lesson again this year because he is saying to you that he made a mistake. He explained to me about what he did, although I don't understand all of it, and said he did not have any excuses. He said it was the right thing for him to say he did something wrong and not make any excuses and he wanted me to understand that. (Exhibit E)

Likewise, Mr. Wolff's wife, Ursula recounts that:

> Stuart has always been honest in our marriage and never once in 20 years have I ever lost confidence in his honesty or integrity. Sometimes it is even embarrassing because he will be completely

honest even in social situations where he is just not able to tell the little lies that seem to be expected in these kind of settings.  I love him for this and know that I can always trust him.  He has always been a caring father to our children and he takes the time to listen to them and to teach them…. Stuart teaches our kids to always tell the truth and we do not allow anything other than complete honesty from our children. (Exhibit F)

Long time employee James Thomas, who was at Homestore during the time period covered in the indictment, attests to Mr. Wolff's character, empathy, and sincere desire to utilize his intelligence to help society, recounting:

I have known Mr. Stuart Wolff since May 1998.  It has been my distinct pleasure to have worked for him in various capacities as an Operations Specialist at Homestore.com, and most recently as a Research Analyst with Scinovate Research Company.  In both instances these companies were founded to assist the general public in various ways helping the consumer….Mr. Wolff was always open and truthful with me….which I felt demonstrated a high level of personal integrity and honest concern….(Exhibit G)

Not only has Mr. Wolff shown his character to family and those he grew up with, but he has shown these same positive character traits and commitment to friends over the last 25 years.  Mr. James Geraghty, who has known Mr. Wolff since the first week of college, states:

From the very first week of freshman year in college, Stuart recognized my unlimited potential.  He recognized immediately how much I wanted to succeed in this academically challenging environment.  He took it upon himself to challenge me….He taught me the importance of academic integrity and how the honor code worked and why it was so important to follow it.  When I would skip class he would tell me that I was only hurting myself.  When I drank too much he told me I was poisoning my mind and body.  When I didn't study as hard as he did, he would tell me that I was potentially wasting the great opportunity that I had been given….Stuart never wavered in his support and help.  No one even knows about any of this until now because Stuart never talks about it.   (Exhibit H)

Similarly, twenty-year friend and former co-worker Cliff King, says:

I have known and kept in contact with Stuart since 1989 when we worked together doing scientific research at Bell Laboratories in

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

Murray Hill, New Jersey.  I have known Stuart to be an extremely honest and trusted colleague.  He had a very good reputation at Bell Labs for doing honest and solid research.  I can also tell you that he is a friend who has always been willing to put his family and friends first. (Exhibit I)

Church and outreach programs were and remain very important to Mr. Wolff. Rabbi Ted Ritter reflected this in his letter, commenting:

I am writing this letter on behalf of Stuart Wolff.  Stuart and his family have been members of my congregation in Thousand Oaks for almost ten years.  During this time they have shown a devotion to their children and a commitment to the Jewish community of the Conejo Valley…. It is also my belief that Stuart and Ursula are model parents: consistently putting their children first and looking out for their best interests as they grow and develop.  (Exhibit J)

Importantly, Mr. Wolff has always focused his work efforts on things he thought added value to society, and this started from a very young age, as recounted by Diana Wolff:

He has always worked on projects that had great potential to help others and make the world better.  His science fair project was on alternative energy and this was 30 years before today's environmental crisis.  (Group Exhibit D)

Similarly, Bernard and Marcia Robinowitz recount the following experience:

My wife and I worked with Stuart to develop a new method of writing prescriptions.  Our goal was to make the world a safer and more efficient place; Stuart tirelessly and honestly endeavored to help us succeed; this was not the work of a criminal.  Just the opposite he worked for the betterment of all.

*       *       *       *

In the 1990's, Stuart, my husband, and I tried to start a company that would have eliminated many prescription errors and increased patient prescription compliance.  Stuart and Bernard were the idea men; I was the technical/bookkeeper person.  We did not get a patent covering our product, but we did incur expenses.  I would tell Stuart the amount we had to come up with, and he would contribute his share.  He never once asked me if he could see my records or doubted the costs presented.  In every respect, Stuart was an honest and honorable partner as he has been throughout his whole life.  (Group Exhibit K)

Even today, fully realizing that he will soon be imprisoned, Mr. Wolff continues to use his intellect and energy to try and help others.  His partner in one endeavor, Mr. James Geraghty, explains:

> We have developed a program called the 'Computer Youth Academy' that I am very excited about.  I am on the Advisory Board of the Government sponsored Neighborhood Networks National Consortium (NNNC) and our Computer Youth Academy has tremendous potential to help this program achieve its ambitious goals with respect to educating children in affordable housing…. I need him, organizations like NNNC needs him, and most importantly, there are many kids that also need him.  (Exhibit H)

Similarly, Mr. Wolff's partner (James Thomas) in a venture called Scinovate Research Company, echo's these same sentiments:

> In both instances these companies were founded to assist the general public in various ways helping the consumer to ensure fairness within difficult transactions that would otherwise be complex and time consuming in nature.  In both cases the public was well served by these highly sophisticated and forward thinking applications, and it is my hope that this meaningful and unselfish work on behalf of others will be taken into consideration by you.  (Exhibit G)

There is simply no question that people who know Mr. Wolff well believe that a three year sentence of incarceration, potentially followed by some form of community service, would serve best the interests of society to both punish and rehabilitate.  Beth Richtman sums this up eloquently:

> I've known Stuart long enough to know that he is a person with an incredible capacity and desire to do good things for the world.  I know this situation has been extremely difficult and humbling for him.  I know how deep his regrets are.  I know that in the future Stuart will make sure to never ever do anything remotely close to any bright line again.  I honestly hope that he'll be able to quickly get back to what he does best: work with others on thinking through difficult problems whose solution could make the world a better place and in general inspiring people like me to work hard toward our own dreams.  (Exhibit L)

Similarly, Bernard Robinowitz confirms and suggests that because Mr. Wolff "has a great mind for science" a sentencing court should consider imposing a sentence to "use

7

his talent to benefit the country." (Exhibit K). As amplified below, we urge the Court to consider fashioning just such a sentence that imposes punishment (3 years incarceration) followed, if the Court believes something more is needed, by some form of community driven service, so that Mr. Wolff can continue giving back to society as he can so ably do.

### B.   Background Of The Offense

As the Court knows, Mr. Wolff is an engineer by education and training. Mr. Wolff's first job was at IBM, where he worked as an Integration Engineer and learned to make computer memory chips. After leaving IBM, he worked in Tulsa, Oklahoma for approximately one year as an Informative Technology Director before taking a job at TCI Interactive in 1993. From 1993 to 1996 at TCI, Mr. Wolff worked on issues regarding health care, creating an interactive television system that would be used to provide information to viewers to help medical patients, among others, make informed decisions. While working at TCI, Mr. Wolff and the company began looking at the Internet as a way to communicate information to those who needed it the most.

It was during this time period that Mr. Wolff recognized that the real estate market could benefit by using the Internet to provide information to consumers interested in purchasing a home. Mr. Wolff began talking with the National Association of Realtors ("NAR") to see if he could bring TCI and NAR together in a deal. After TCI declined to pursue the venture with the NAR, Mr. Wolff started working with the organization on his own, and was subsequently asked by the NAR to become the Chief Executive Officer of the company that eventually became Homestore. He was 33 years old at the time, with no upper management experience, and though highly educated, had no education or experience with accounting rules, best business practices, or regulatory/legal requirements.[1]

---

[1] This information is provided not to excuse Mr. Wolff's subsequent criminal actions, but simply to put them into context, as Mr. Wolff was a young, inexperienced executive running a booming internet company at the height of the Internet explosion.

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

Homestore started out as a small private company with less than 25 employees for the first few years.  However, in a very short time--and by the year 2000--the company had several thousand employees who reported through various executives to Mr. Wolff.

Homestore had gone public (via an initial public offering) in 1999.  One significant consequence of that was that the company's financial results--and particularly its revenues--became a dominant measuring stick of the company's success.  As a result, the company looked aggressively to conclude transactions that could generate reportable revenue.  This aggressive mind-set led to horrible decisions in 2001, but to best put that 2001 criminal behavior into context, we refer to the sentencing memorandum filed on behalf of Peter Tafeen, a top executive at Homestore in 2001.  Mr. Tafeen is someone the government previously characterized as providing nothing but blunt and honest descriptions of the events of 2001.[2]  Here is Mr. Tafeen's candid reflection of those events:

> [I]n 2000 Homestore engaged in several two-party roundtrip transactions that essentially involved the company recognizing its own cash as revenue.  Mr. Tafeen, who had no knowledge of the relevant accounting rules, was informed at the time by members of Homestore's Finance Department that these transactions were permissible.  Some members of the Finance Department (including former Homestore CFO Joseph Shew) have continued to maintain that the roundtrip transactions that took place in 2000 were permissible under the accounting rules.
>
> *   *   *   *
>
> In the first quarter of 2001, Homestore was on pace to badly miss its revenue targets.  Mr. Tafeen was told by the Finance Department that because of new accounting rules he could no longer use the two-party roundtrip deals to make up the shortfall.  He spoke with his counterpart at AOL (Eric Keller) about ways to generate revenue, and Mr. Keller suggested turning the two-party roundtrip deals into three-party roundtrip deals….  Mr. Tafeen believed the roundtrip deals were improper from the outset…. But perhaps reflecting the mentality of the pre-Enron era, Mr. Tafeen did not stop to think of the consequences (to

---

[2] Government's Motion For Downward Departure (for Peter Tafeen) dated 10/23/06, pp. 1-2, 7-8, 10-11, 14-15.

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

himself or to others) of what it meant to engage in transactions solely for the purpose of creating bogus revenues. He wrongly assumed that the worst that would happen was that the SEC might require the company to restate its public filings. The idea that his conduct was criminal and could lead to prison time never entered his mind until long after the fact.

Mr. Tafeen's admissions and insights are important to this sentencing for several reasons. First, they confirm that Mr. Wolff did not conceive of the scheme, instigate it, or participate in its day-to-day implementation. Indeed, the government acknowledges such, commenting, "Wolff did not conceive of the revenue inflation scheme alone, nor was he involved in all aspects of its day-to-day execution." (Government Sentencing Memorandum, 3/11/10, p. 3). Second, like Mr. Tafeen, Mr. Wolff did not stop to think of the consequences (to himself and others) of not using his power and authority to stop the illegal revenue-recognition practices. As explained in his letter to the Court (Exhibit M), in retrospect Mr. Wolff's bad choices and wrongful decisions now seem to have been clear cut, unambiguous, and simple choices between right and wrong and Mr. Wolff so recognizes today. But, at the time, the incremental process of moving from good and acceptable in 2000 to bad and criminal in 2001 led him to rationalize and attempt to justify conduct that had no justification. Mr. Wolff accepts that now and for that he will be punished. But for the reasons below, we urge the Court to impose a three year sentence, which would be much more time than any of the other executives received (*see* at 33-37 *supra*)--which we urge is a proportionate and just result.

As a footnote to this Background section, it is relevant to note that in November 2001, Homestore executive Allan Merrill learned of a third-party's request for a kickback to keep part of the scheme quiet. Mr. Merrill notified Mr. Wolff of the situation, despite requests by Mr. Shew and Mr. Giesecke that he not do so. Mr. Wolff did not try to cover-up these facts or bury the investigation at that time. Although he certainly could have tried to do so, Mr. Wolff immediately alerted Homestore's Board of Directors, triggering the internal investigation that led to the entire revenue recognition situation being uncovered and vetted.

C.      **The Offense and Its Aftermath**

The conduct involved in this case is accurately reflected in the plea agreement. This offense is Mr. Wolff's first and only experience with the criminal justice system. As explained above, it was the product of a lapse in good judgment and the mistaken (and yes, indefensible) 2001 belief that these were accounting decisions that might lead to SEC battles and restatements, but not criminal behavior that was hurting others and could lead to prison time. Mr. Wolff knows now that his actions were and remain wrong and he fully accepts that fact. The government disputes this contention, incorrectly portraying Mr. Wolff's acceptance as "grudging" and only provided on the eve of trial. (Government Sentencing Memo. at 3, 14). That portrayal is inaccurate and is belied by the evidence and testimonials detailed below.

First, Mr. Wolff's probation officer (whom the government accurately describes as "experienced") interviewed him on February 2, 2010, and concluded that Mr. Wolff had accepted responsibility for his crimes. Indeed, the probation officer quotes first hand his acceptance of responsibility.  (PSR ¶ ¶ 81, 97).  Second, the timing of Mr. Wolff's plea must be put into the proper context.  As this Court well knows, after current counsel was retained and this Court authorized early return subpoenas, we uncovered proof that the evidentiary record was inaccurate and seemingly had been tampered with.  In defense counsel's professional judgment, neither counsel nor Mr. Wolff could properly analyze any plea bargain until those issues were resolved.  Specifically, the defense had sufficient proof that Pricewaterhouse Coopers ("PwC") had materially altered numerous workpapers after the commencement of the Homestore internal investigation, including key exhibits that the government introduced into evidence in the first trial, and that PwC's lead audit partner had provided false testimony at the first trial in relation to those modifications.

In mid-July 2009, and as part of the process of trying to resolve the case, the defense provided its proof to the government so that the government could conduct its own independent investigation.  In fact, the government agreed to move the trial date to

allow itself an appropriate amount of time to investigate the matter. We do not intend to re-visit the issues surrounding PwC's actions, but it is eminently fair to note that the PwC issues were an impediment to finalizing plea negotiations and needed to be resolved before a plea deal could be consummated. Indeed, as reflected in its filings of November 13, 2009, the government acknowledges that there were problems with PwC's records and witnesses and that Mr. Wolff's positions had some "merit". (Government Resp., Nov. 13, 2009, at 2). Moreover, the government agreed not to call any PwC employee as a witness or submit any PwC records into evidence. (Id. at 3). The government further agreed not to seek to establish that one of the objects of the charged conspiracy was to commit the offense of lying to the auditors. (*Id.*) Thereafter, the Court denied defendant's further requests for relief. It was only at this juncture that the defense, for the first time, felt it could analyze the entire landscape and the evidence the Court would allow the government to introduce at trial. These pre-trial motions cleaned up an infirm record and opened the door to finalizing plea discussions. Thus, the truth is that Mr. Wolff did <u>not</u> grudgingly accept responsibility for the (amended) conspiracy count or unnecessarily delay his acceptance until the eve of trial. Mr. Wolff properly and appropriately sought resolution of a key component of the case and pled shortly after that pre-trial issue had been decided. The government's claim that Mr. Wolff pled late in the game is wrong and we hope this Court understands why the defense needed to explore the PwC issues before any plea bargain could be consummated. Mr. Wolff should not be penalized for that the fact that his new counsel found conflicts and infirmities in the record and sought to resolve them.

The government's claim that Mr. Wolff has only grudgingly accepted responsibility is further belied by the attached testimonial letters that recount how profoundly he has accepted his responsibility and is bound and determined to make amends for his misbehavior. In addition to these letters, Mr. Milton Wolff recounts as follows:

> By working very hard, Stuart built Homestore from a sleepy little
> company that was about to go broke to an important contributor to the

real estate market.  Of the thousands of Internet companies that were created in the 1990's, it is still one of the few Internet companies that is still around even to this day.  He did a lot of things right in building up Homestore and then he did some things very wrong.  I know Stuart feels very remorseful and sorry that people were hurt by his bad decisions.  As his father I also feel terrible about it.  Both of us have talked extensively and in detail about what went on in 2001 and he knows and accepts the role he had in the problems.  He knows he could have stopped the deals and he wishes he had taken action to terminate the executives that put the problematic deals together.  (Exhibit C)

Similarly, practicing attorney Tim Sottile (a former clerk to Judge Lew who knows the import of being candid in these letters) and a long time friend of Mr. Wolff's describes:

Having known Stuart Wolff for the last thirteen years as a family friend…. I can think of no other person who has come to such a sincere acceptance of responsibility for the actions that have brought him to this point and who is so profoundly sorry for the pain that his actions have caused others.

*       *       *       *

He exhibited this concern through the philanthropic programs he made a priority at his former company ???such Habitat For Humanity and his ongoing efforts to personally fund and develop initiatives to promote computer programming skills and technical literacy for inner city kids.  He has not engaged in these good works with fanfare or publicity but in an understated way with an eye to achieving positive results for those who could benefit from his efforts rather than to gain attention or recognition for himself.

*       *       *       *

Having known him before his company went public and after, during its highs and lows, and throughout the long and difficult period leading to his sentencing I can tell you that he always remained the same concerned, honest and hard working person.  (Exhibit N)

Similarly, Cindy Zelby notes the following:

It is frankly hard for me to understand how my brother ended up in this unfortunate situation.  I know he feels really bad about it as do my parents and myself.  We are a close knit family and the last thing we

would want is for any of us to hurt other people.  I have talked to him many times about it and I know he feels bad that others were hurt by his actions.  I do know as his sister, that his mistakes from 2001 were highly atypical of his normal behavior. (Exhibit B)

Diane Wolff echo's these same sentiments:

Something went wrong in his life at Homestore - he knows that and I know that and you know that.  He has never intentionally harmed anyone in his life but people did get harmed by his actions at Homestore and he feels very sorry that these people were hurt by the mistakes he knows he made.  Stuart accepts and feels remorse for his wrong doing and hopes to spend the rest of his life helping others and making up for this.  He has never before hurt anyone or broken the laws of the United States, his religion or our family.  He has never before lied, cheated or stolen anything from anyone in his life.
(Group Exhibit D)

Additionally, Cliff King, who recently spent time with Mr. Wolff, relays that:

Stuart and his family welcomed me into their home last month for a short visit, and I had an opportunity to speak with him regarding the plea and the events in 2001 for which he will be sentenced.  Stuart very much wanted to talk to me about the mistakes he had made and expressed great regret about what had happened.  I know him well and I can tell you that he has suffered greatly over this experience.  I know Stuart Wolff to be an extremely honest person, and I do not believe that anything like the events of 2001 will ever occur in his life again. (Exhibit I)

Finally, business associate and former Vice President at Homestore Stephen Bove sums up the complexity of sentencing a person like Mr. Wolff eloquently:

Unlike many web-internet companies, the products at Homestore very frequently if not always relied on complex upfront deal-making with numerous parties, and ongoing maintenance of the delicate relationships around those contracts as the products evolved.  The number of "deals" upon which Homestore was built was astounding and the architect/diplomat/strategist behind those deals and the design of the products that served them was Stuart.  The company could simply not have existed without him.  Since 2001, I think Stuart's role in non-financial dealings at Homestore has been largely overlooked, especially the tremendous load those deals placed on him and the deep amount of creativity he had to have to craft them and hold the

company together as we careened forward into a marketplace battling massive competitors like Microsoft, Yahoo and AOL.

*       *       *       *

At Homestore, we were literally saving our customers millions of hours and tens of millions of dollars each year…. The missteps he made in 2001 were, in my humble view, an extreme anomaly, and a great tragedy, given how much good he had done….there is no doubt that bad decisions were made and lines of legality crossed.  And in recent discussions with Stuart his obvious contrition and humility have made me sure that he recognizes that he made terrible mistakes, knows what he did was wrong, and feels tremendously bad about any harm he may have caused to his shareholders, his friends, his family and all of us who were on the team at Homestore.  (Exhibit O)[3]

## IV.   Factor Two:  Purposes of Sentencing

The proposed binding plea agreement, which the Court indicated at the plea hearing it intends to accept, will result in a sentence within a range of three to five years. We respectfully urge the Court to impose three years which would fulfill the law's mandate for fashioning a sentence "sufficient, but not greater than necessary," to satisfy the purposes of sentencing.  Section 3553(a)(2) specifically requires:

(2)   the need for the sentence imposed -

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense [retribution];

(B)   to afford adequate deterrence to criminal conduct [general deterrence];

(C)   to protect the public from further crimes of the defendant [specific deterrence]; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner [rehabilitation].

1.   Retribution: In regard to retribution, we acknowledge that Mr. Wolff's conduct warrants a punitive response.  Three years away from his children, wife, friends

---

[3] Attached hereto as Group Exhibit P are copies of additional letters in support of Mr. Wolff.

15

and community is punitive and a just punishment for the offense.  Mr. Wolff's criminal conviction, reported in the press and forever available in this internet age, effectively brands him a pariah for the rest of his life.  Moreover, the eight-year pendency of the investigation, accompanying civil suits, SEC proceedings, PwC investigation, and proposed restitution award have been draining emotionally and physically and will almost if not entirely wipe out Mr. Wolff financially--a circumstance from which he will have a hard time recovering once released from prison at age 50, or beyond.  In a very real sense, a three year prison sentence will vindicate the law's rightful interest in retribution.

2.    General Deterrence:  General deterrence may be one of the trickiest interests to properly assess.  Too much quickly leads to disproportion and injustice for the individual and serves to mar, not encourage respect for the law, to the observing public.  Moreover, in cases of white collar crime, there is no evidence that a long sentence (five years) would be a more effective deterrent than a three year prison sentence.  *United States v. Adelson*, 441 F. Supp.2d 506, 514 (S.D.N.Y 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d Cir. 2008) ("But as to [general deterrence], there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders) (*citing* Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998).  *Cf* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis in original).

Indeed, white collar offenders are likely to be deterred by enforcement of the kind the defense suggests here (three years) and by the sentences already imposed on the eleven defendants sentenced to date.  Frase, *supra* at 70.  In fact, the Government

specifically acknowledged that a 21-27 month sentence would send the right message in its Sentencing Position paper relating to this fraud's architect, Peter Tafeen, stating:

> The Government respectfully requests that the Court sentence Tafeen to a term within this range.  The Government believes that a sentence within the 21-27 month range will be fair and reasonable under the factors contained in 18 U.S.C. 3553(a).  (Page 14).

> \*       \*       \*       \*

> A moderate prison term is necessary to protect the public from further crimes from defendant and to deter him and others from further misconduct.[4]  Because Tafeen was a senior executive and ringleader of the fraud scheme, the Court needs to send a message of punishment and deterrence to the business community.

In Mr. Wolff's case, the ineradicable stigma of the conviction, the permanent end to business and career, the personal financial devastation, and the loss of his freedom for three years at this stage of his life, all serve as sufficient assurance that persons similarly situated to Mr. Wolff will get the message to not involve themselves in the sort of fraud at issue here.  A three year prison term, for this first time offender, will satisfy the element of general deterrence.

3.   <u>Specific Deterrence</u>:  The goal of specific deterrence is to protect the public from further crimes by the defendant.   18 U.S.C. § 3553(a)(2)(C).   In this case, any sentence over three years will not further this goal.   In fact, the government candidly "acknowledges that Wolff's history and characteristics do not suggest that he presents a danger to society beyond the facts of this case."  (Government's Sentencing Memo. at 18).  Mr. Wolff has no prior record and has no propensity to engage in criminal conduct. Indeed, all the evidence about Mr. Wolff's character indicates the unlikelihood of him ever engaging in criminal activity again.  During the first trial, the testimony revealed that Wolff was not greatly motivated by greed, as so stated by the cooperators.  (*See* Trial Tr., June 1, 2006, at 79: 19-24).  Moreover, since the 2001-02 investigation (over 8 years ago), Mr. Wolff has never come close to committing an illegal act, he has complied with

---

[4] 18 U.S.C. §§ 3553(a) (2) (B) and (C).

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

all the terms of his pre-trial release, and he has worked hard in lawful business practices to provide for his wife and three young children. The letters written on his behalf speak of his generous nature, his love for his family, his kindness, his intelligence, his helpfulness, his caring and nurturing personality, and his sense of social responsibility. From family, friends, and employees, all the letters plead with the Court not to deprive society, his community, or his family of his positive contributions for more than the required three years.

    4.  <u>Rehabilitation</u>:  In all candor, the purpose of rehabilitation has little relevance in Mr. Wolff's case, given his background and lack of any dependencies. What Mr. Wolff will need to do upon leaving prison is to use his intellect and determination to secure work to help support his family and repay whatever debt may be left to repay.

## V.   <u>Factor Three:  The Kinds Of Sentences Available</u>

Post-*Booker*, the Court may consider a wide range of alternatives in fashioning a just sentence. We believe and respectfully request that three years incarceration is sufficient, but not greater than necessary, to justly address Mr. Wolff's offense, allow him to return to his loving family, and resume contributing to his community related projects.

If, however, the Court feels something more than three years is required, we urge the Court to impose a term of one or two years of home detention on top of the three years of incarceration.[5]  Such a sentence could be conditioned on Mr. Wolff continuing his work on behalf of the disadvantaged while also possibly permitting him to find paid employment to help support his family.  It also would allow Mr. Wolff to again parent his three children, a vital role in this very complex society.  This Court has the authority and discretion to so order and we urge the Court to consider this option if it deems three years incarceration insufficient.

---

[5] Co-defendants Tafeen and Shew were permitted to serve a portion of their sentences in home detention.

## VI.   **Factors Four And Five:  The Sentencing Guidelines And Policy Statements**

Mr. Wolff recognizes that his conduct caused loss to individual investors in this matter; he has acknowledged this by pleading guilty and we do not dispute that fact here. However, because the Court must consider the applicable Sentencing Guideline range before imposing sentence (18 U.S.C. 3553(a)(4)) we are compelled to address the loss calculation theories proffered by the government.

Under the relevant Guidelines, the loss attributable to this fraud-based conspiracy overwhelmingly drives the suggested period of incarceration.  The government pushes hard on high loss positions in what is clearly an attempt to overshadow all other relevant sentencing factors.  Out of fairness, we note that the government minimized and virtually ignored these high loss figures and positions (with correspondingly high Guideline ranges) in its sentencing papers related to Mssrs. Tafeen, Giesecke, and Shew.  Under the loss analysis the government now advocates against Wolff, these other defendants  faced Guideline ranges of 262-327 months, yet each of them received a very modest sentence.[6] Despite those earlier sentences, the government sets forth several alternative theories to formulate "loss" and asks this Court to enhance Mr. Wolff's offense level pursuant to U.S.S.G. § 2F1.1(b)(1)(S) "by 18 levels for a loss exceeding 80 million."[7]   (Government Sentencing Memo. at 10).   The government advocates two theories to justify this enhancement:  (i) the Average Victim Loss theory; and (ii) the Market Capitalization theory.  Without unduly belaboring the point, in light of the statutory maximum cap involved, both of these theories are flawed; they are not supported by any evidence provided to the defense or the Court and, thus, overstate the provable loss in this matter. Accordingly, for the reasons set forth below, the defense suggests that the Court utilize Mr. Wolff's <u>net</u> gain from stock sales during the fraud period as a proper alternative

---

[6]Mr. Shew received a sentence of six months incarceration; Mr. Giesecke received a sentence of twelve months incarceration; and Mr. Tafeen received a sentence of twenty-seven months incarceration.

[7] The probation department, without analysis, has applied an 18-level enhancement to Mr. Wolff's base offense level accepting that, under the theories advanced by the government "loss to shareholders is at least $130 million," while at the same time candidly conceding that the "Court is in the best position to determine which [loss] theory should be applied to this case."

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

measure of loss (as endorsed by comment note 9 of U.S.S.G. § 2F1.1 of the applicable Guidelines). This would result in the Court finding a "gain" of between $5 and $10 million, which would still result in an increase of Mr. Wolff's offense level by 14 levels, pursuant to U.S.S.G. § 2F1.1 (b)(1)(0)--four levels less than the 18-level increase the government suggested. Although this decrease in offense level is not dramatic, it is the only approach justified by the evidence and counters the government's suggestion of more than a $1 billion dollar loss, which unfairly casts the harm of Mr. Wolff's offense in a light that is unwarranted--a light that was not focused on any of Mr. Wolff's previously sentenced co-defendants.

### A.   <u>Average Victim Loss Theory</u>

As an initial matter, "the government bears the burden of proof on the facts underlying a sentencing enhancement." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007), *citing United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (*en banc*) ("When the government seeks an upward adjustment, it bears the burden of proof."). In addition, because the government's proposed 18-level loss enhancement under § 2F1.1(b)(1)(S) would have an "extremely disproportionate effect on the sentence relative to the conviction, the government must prove such a factor by clear and convincing evidence." *United States v. Lynch*, 437 F.3d 902, 916 (9th Cir. 2006).[8] Simply put, the defense and the Court have not been provided evidence to support losses

---

[8] The government correctly notes that in *United States v. Berger*, the Ninth Circuit recently held that a court need only find a disputed loss enhancement by a preponderance of evidence "where sentencing enhancements for financial loss are based on the extent of the fraud conspiracy." 587 F.3d 1038, 1048 (9th Cir. 2009). However, this Circuit has employed a totality of circumstances test for determining whether the heightened standard of clear and convincing evidence is required. *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010) ("Whether a sentencing enhancement causes a disproportionate impact warranting clear and convincing proof necessitates a look at the totality of the circumstances"). Without belaboring the point, it is the defense's position that this Court should use the heightened standard because: (1) the government is seeking an 18-level increase based upon loss which will more than double the length of Mr. Wolff's advisory sentence; and (2) the loss enhancement is not limited "to the extent of the criminal conspiracy" but rather it includes unproven conduct -- for example "losses" incurred in the third quarter of 2001. In any event, as detailed below, whether this Court utilizes a preponderance or clear and convincing standard, the government has failed to meet its burden on the loss issue.

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

to "average victims" caused by defendant's fraud.  The Average Victim Loss approach advocated by the government here took the average daily closing price of Homestore stock during the period of the alleged fraud (April 26, 2001 through December 21, 2001); subtracted the average daily closing price for a period following the disclosure of the fraud (here, February 22, 2002 through May 15, 2002); and then multiplied the difference by the number of outstanding shares as of the end of the first quarter of 2001, reduced (only) by the number of shares owned by Mr. Wolff at that moment. Utilizing this approach the government mathematically estimated a loss of approximately $1.6 billion.

This simplistic approach completely ignores the required analysis of actual causation in fraud sentencings.  Recently, in *Berger*, 587 F.3d 1038 (9th Cir. 2009),[9] the Ninth Circuit rejected defendant's efforts to have the Supreme Court's civil securities fraud standard (*e.g.* the complaint must allege that the practices plaintiff contends are fraudulent were revealed to the market and caused the resulting losses (in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 341-43 (2005)) applied to criminal sentencing. Rejecting the application of *Dura* in the criminal context, the Ninth Circuit broke from the Second and Fifth Circuits and held that "where the value of securities have been inflated by a defendant's fraud, the defendant may have caused aggregate loss to society in the amount of the fraud-induced overvaluation, even if various individual victims' respective losses cannot be precisely determined or linked to the fraud." *Id.* at 1044. Significantly, the Ninth Circuit did not, however, abandon the notion of actual causation in fraud sentencing; rather, the Court specifically noted that:

> the fact that "[t]he court need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1, cmt. n. 3, § 2F1.1, cmt. n. 8, does not obviate the requirement to show that actual, defendant-caused loss occurred. Rather, the plain language of the Guidelines commentary merely indicates that, in arriving at the loss figure, some degree of uncertainty is tolerable. . . the Guidelines' statement that the "estimate [of loss] ... may be based on the approximate number of victims and an estimate of the average loss to each victim," U.S.S.G. § 2F1.1, cmt. n. 8,

---

[9]  The Court in <u>Berger</u> analyzed loss under both the pre-2001 amendment to the fraud guidelines (Guideline section 2F1.1) and the post-2001 amendment (Guideline section 2B1.1).

> *presupposes* that the court has already determined that some
> defendant-caused loss occurred. . . In sum, each of these possible
> methodologies assumes that some loss was proximately caused by the
> defendant, while recognizing that the amount of loss may not be easily
> measurable.

*Id.* at 1045-46 (emphasis in original).   Thus, "actual, defendant-caused loss" is the standard this Court must employ in determining loss and the government's theories gloss over this standard in multiple respects.   To begin, although the government need not precisely identify each victim's loss (*id.* at 1044), here it has not even identified the number of shareholders who sustained a legally cognizable "loss."   Instead, the government urges this Court to base its loss finding on the total number of Homestore shares outstanding (minus Mr. Wolff's shares), *regardless of when those shareholders bought or sold their shares*.   This approach is fatally flawed because: (1) a shareholder who purchased stock before the fraud period should not be counted for loss purposes; (2) shareholders who sold their stock *before the fraud was revealed* likewise should not be counted for loss purposes as, without the revelation of fraud, Homestore's stock still dropped from $34 per share to $3.60 per share between April 25, 2001 (date the fraud began) and December 21, 2001 (date the fraud was revealed); and (3) *after* the fraud was disclosed, the government has not provided this Court with evidence to "disentangle the underlying value of the stock, inflation of that value due to the fraud, and . . . deflation of that value *due to unrelated causes*" (*Zolp*, 479 F.3d at 719).

The Ninth Circuit has implicitly rejected the government's methodology here-- taking the average price during the fraud, subtracting the share price after the fraud was disclosed, and multiplying that number by the outstanding Homestore shares (less those owned by Mr. Wolff). *Zolp*, 479 F.3d at 719.  As the Ninth Circuit held:

> Measurement of loss becomes considerably more complex, however,
> when the court confronts a 'pump and dump' scheme involving an
> otherwise legitimate company.   In such a case, because the stock
> continues to have residual value after the fraudulent scheme is
> revealed, *the court may not assume that the loss inflicted equals the*
> *full pre-disclosure value of the stock; rather, the court must*
> *disentangle the underlying value of the stock, inflation of that value*

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

> *due to the fraud, and either inflation or deflation of that value due to unrelated causes.*")

*Id.* (emphasis added).

The government's reliance on *United States v. Bakhit*, 218 F.Supp.2d 1232 (C.D. Cal. 2002) to support its "average victim loss theory" also is misplaced. While superficially supporting this theory, *Bakhit* reveals a fundamental flaw in the government's analysis here. Specifically, in setting forth the average victim loss theory, the *Bakhit* court explained that "[a]s all of the shares [subject to the average victim loss analysis] were purchased during the life of the fraud, each one was subject to this overvaluation and the subsequent loss." *Id.* at 1242. Unlike *Bakhit*, here, the government has introduced no evidence whatsoever that *any* of the 104,275,843 shares allegedly at issue were purchased during the fraud period, much less which ones, which is the government's burden.[10] Thus, the government's reliance on the Average Victim Loss theory necessarily fails.

## B.   Market Capitalization Theory.

Alternatively, the government proposes a Market Capitalization theory, which takes the Homestore stock price on December 21, 2001; subtracts either the stock price when Homestore resumed trading on February 22, 2002 or when its corrected financial statements were issued on April 1, 2002; and then multiplies the difference by the number of outstanding shares. Under this approach, the government estimates loss at either $314 million or $146 million.[11] Although, the Market Capitalization theory is an

---

[10] The defense acknowledges that shares undoubtedly were purchased during the period of the fraud and that there was loss in this case; however, the government has not carried its burden to demonstrate how many such shares are at issue here. The following example proves this point. In Homestore's April 2002 proxy statement, the Company confirmed that Cendent Corporation owned 19,756,303 shares of Homestore stock, or approximately 16.3% of the company's outstanding shares. Cendent acquired these shares as part of the Move.com acquisition, which closed in February 2001--prior to the events in question.

[11] The defense submits that the government has failed to sustain its burden to prove its Market Capitalization theory. Nevertheless, if the Court would be inclined to adopt this theory, at a minimum it should utilize January 7, 2002--the date Homestore's shares first resumed trading--and the corresponding closing price of 2.46 per share for a per share difference of $1.14. *See* http://www.nasdaq.com/Newsroom/news/pr2002/ne_section02_005.html. The reported volume of

improved attempt to calculate aggregate loss linked to the fraud as required under *Berger*, the methodology by which the government purports to implement this theory suffers from the same infirmities discussed above:  (i) there is no evidence as to how many shareholders sold how many shares after the fraud was revealed[12]; and (ii) there is no evidence to disentangle the underlying value of the stock from inflation due to fraud and deflation of that value due to other causes.  Consequently, the defense and the Court have not been provided evidence or an economically sound basis on which to attribute all of the government's claimed drop in price to the matters at issue in this case.

That said, the defense does not argue that there was no loss in this case, but that we do not have the evidence to calculate it.  Given the government's failure to prove loss by either clear and convincing or a preponderance of evidence, the defense suggests that the Court alternatively use Mr. Wolff's net "gain" as the estimate of loss, even though we recognize that "offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss."  U.S.S.G. § 2F1.1, cmt. n.9.  Here, the PSR (at paragraph 68(a)) notes that Mr. Wolff "unlawfully sold a total of 283,000 shares of Homestore stock, resulting in a total *gross* profit of $8,638,106."  However, to be fair, the following must be netted out in order to calculate Mr. Wolff's actual "gain": (1) Mr. Wolff's basis for acquiring the shares at issue ($15,848); (2) his transaction costs in selling the shares ($21,420); and (3) taxes Mr. Wolff paid corresponding to those stock sales ($2,370,205).  Thus, Mr. Wolff's real "gain" was $6,246,147.  (*See* Group Ex. R (records detailing Mr. Wolff's basis, costs, and taxes on the stock sales at issue)).  A finding of a gain of between $5 and $10 million would result in an increase of Mr. Wolff's offense level by 14, pursuant to U.S.S.G. § 2F1.1(b)(1)(O), which when

---

trading that day was 15,900,700 shares.  In addition, if the Court utilizes this theory, it should likewise reduce the number of shares by the number of other insiders who were, in essence, unindicted co-conspirators (including AOL and Cendant).

[12] The government's analysis under the Market Capitalization theory starts with the December 21, 2001 price of $3.60 per share.  However, if a shareholder sold his/her shares after the fraud was revealed, for example on July 25, 2003 ($3.70 share) or July 28, 2003 ($3.88 share), there would be zero loss to that particular shareholder under this theory.  (*See* Ex. Q for closing stock prices on those respective dates).

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

combined with the other enhancements, leaves Mr. Wolff with a total offense level of 26. We have set forth above our arguments regarding the appropriateness of a three year sentence, even in light of this base offense level.

One additional point bears mentioning. An analysis of Mr. Wolff's stock holdings and subsequent sales in 2001 reveal that he did not personally engage in a so-called "pump and dump" scheme. (*See* Ex. S (chart of insider stock sales admitted into evidence as Exhibit 4229)). Below is a summary of those stock sales.

| Percentage of Stock Holdings Sold Through Q2-2001 | |
|---|---|
| Stuart Wolff | 6% |
| Peter Tafeen | 88% |
| Joseph Shew | 65% |
| John Giesecke | 88% |

Thus, in stark contrast to his co-defendants, all of whom sold the vast majority of their stock holdings during the period of the fraud, Mr. Wolff sold just 6% of his holdings. Mr. Wolff's actions were consistent with the testimony of his stock broker, David Goodenough, who testified that Mr. Wolff sold his Homestore stock *at Goodenough's direction* as part of a diversification plan. (Trial Tr., June 7, 2006, at 196-203). Again, without trying to minimize Mr. Wolff's conduct, the percentage of his stock sales (and the external explanation for his decision to sell) puts Mr. Wolff's actions in a more accurate context; a context inconsistent with someone engaging in a classic "pump and dump" scheme.

## VII.   Factor Six:  Disparity With Similar Offenders

18 U.S.C. 3553(a)(6) makes clear that a sentencing court should avoid unwarranted sentencing disparities among similarly situated offenders. We appreciate that it is tricky to try and compare one defendant with another, particularly in this case where a number of offenders pled guilty to charges arising from the same subject matter

and cooperated with the government.  But after factoring in a significant reduction in their prison time for their cooperation, Mr. Wolff's sentence should not be widely disparate from the sentences imposed on the three other high ranking executives integral to this revenue recognition scheme:  Peter Tafeen, John Giesecke and Joseph Shew.  Specifically:

**Peter Tafeen:**  The government candidly acknowledged in the Indictment that Mr. Tafeen was the ring-master of the conspiracy, stating:

> Defendant Tafeen introduced the concept of fraudulent roundtrip transactions at Homestore; supervised and gave directions to the Homestore employees who negotiated the fraudulent roundtrip transactions on behalf of the company; approved all of the agreements between Homestore and the vendors in the first leg of the fraudulent roundtrip transactions; personally participated in the negotiations between Homestore and some of the vendors that led to the secret, verbal side agreements between Homestore and the vendors that were part of the second leg of the fraudulent roundtrip transactions; and personally negotiated agreements between Homestore and some of the intermediaries, including AOL and Cendant, that were part of the third leg of the fraudulent roundtrip transactions.  (Indictment, ¶ 41)

**John Giesecke**:   In the Government's Sentencing Position relating to Mr. Giesecke, the government acknowledged that:

> Giesecke participated in the process of setting Homestore's publicly announced revenue targets during 2001.  In numerous meetings with his colleagues, Giesecke became aware that Homestore was likely to fall short of market expectations based on declining advertising sales.  Giesecke discussed the plan to engage in the fraudulent roundtrip deals with Wolff, Tafeen, and Shew in numerous meetings throughout the year.  Giesecke agreed with the others to implement the illegal deals.  He also personally signed wire transfer requests enabling Homestore to spend millions of dollars on the transactions.  After the end of each fiscal quarter, Giesecke participated in recorded conference calls with investors in which Wolff, Giesecke, and Shew lied about Homestore's financial results.  (at 4-5).

*     *     *     *

> In short, Giesecke was in virtually the same position as CEO Wolff.  (at 9).

**Joseph Shew**:  The Government's Sentencing Position for Mr. Shew stated:

> Shew was the Chief Financial Officer of Homestore and a key member of the company's control group.  Shew was at the heart of the accounting fraud scheme.  Shew directed the plan to inflate Homestore's revenues, hide the truth from the company's auditors, and lie to investors.  The fraud scheme could not have succeeded for as long as it did without Shew's culpable participation.  (at 1).

*      *      *      *

> Shew met with Tafeen in March 2001 to discuss inflating Homestore's revenue through the use of fraudulent roundtrip deals.  Shew later discussed the deals with Wolff and Giesecke.  When Homestore implemented the roundtrip deals during the first three quarters of 2001, Shew and his Finance Department were responsible for concealing the true nature of the deals from PWC.  Shew also personally signed wire transfer requests enabling Homestore to spend millions of dollars on the transactions.  After the end of each fiscal quarter, Shew participated in recorded conference calls with investors in which he, Wolff, and Giesecke lied about Homestore's financial results.  Shew then signed Homestore's SEC filings that falsely reported inflated revenue for the company based of the roundtrip deals.  (Pages 5-6).

As the government's own descriptions make clear, the three key cooperators critical to the revenue recognition scheme were in fact situated similarly to Mr. Wolff.  Indeed, the government has stated that COO "Giesecke was in virtually the same position as CEO Wolff."   The chart below details the sentences faced by each of the above individuals and the sentences they actually received after the Government's Motions for Downward Departures were granted:

| Name | P.O. Advisory Guidelines Level[13] | P.O. Advisory Prison Range | 5k 1.1 Filed | Sentence |
|---|---|---|---|---|
| Peter Tafeen | 29 | 87-108 | Yes | 27 months |
| John Giesecke | 39 | 262-327 | Yes | 12 months/1 day |
| Joseph Shew | 39 | 262-327 | Yes | 6 months |

---

[13] "P.O." means Probation Officer.

We realize and accept that Mssrs. Tafeen, Giesecke, and Shew received consideration for cooperating with the government and testifying for the government at trial. We do not minimize that such cooperation is important to aid criminal investigations and that cooperators justifiably receive a more lenient sentence than those who later plead guilty, such as Mr. Wolff.  In fact, we agree with the government that Mr. Wolff should serve a prison term longer than his co-conspirators.  (Government Sentencing Memo. at 19).  However, even factoring in cooperation credit, there should not be a tremendously wide disparity between Mr. Wolff's sentence and that of Mr. Giesecke (who, as the government acknowledged, was in the same position as Mr. Wolff to green-light the fraud); Mr. Tafeen (the admitted master-mind and architect of the scheme); and Mr. Shew (who the government acknowledges was the day-to-day implementer of the accounting fraud and underlying securities crimes that Mr. Wolff green-lighted, oversaw, and ratified).  This is especially true because Mr. Wolff pled guilty before trial, after bona-fide motions involving PwC's misbehavior were aired and ruled on, negating a trial and/or the government's need to prepare for one.  If this Court sentences Mr. Wolff to three years incarceration, that would be three times longer than Giesecke's sentence of twelve months; six times longer than Shew's sentence of six months; and thirty three percent more than Tafeen received as a sentence.  We humbly and respectfully contend that a three year sentence for Mr. Wolff would be a proportionate and just result under every factor of Section 3553(a), but most particularly under this factor of avoiding unwarranted sentencing disparities.

**VIII.  <u>Factor Seven:  Restitution and Fine</u>**[14]

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20 _____

21

22

23

24

25

26

27

28

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING

## IX.   Post Sentencing Issues

### A.   Medical Recommendation

Mr. Wolff suffers from chronic sinusitis.  (*See* PSR ¶ 130.)  As a result, he has undergone at least three surgeries to deal with this condition.  To help combat the effects of Mr. Wolff's sinusitis, he uses on a daily basis a specialized treatment his doctor created for him several years ago.  Per the recommendation of the probation officer, we request that the Court recommend that Mr. Wolff be allowed to continue with his daily treatment, as his sinus infections became much less frequent after he began using the regimen; indeed, Mr. Wolff did not have any sinus infections in 2006 until he was incarcerated at the Metropolitan Detention Center ("MDC"), where he was not provided with the medicine he needed for his prescribed, daily sinus treatment.  Indeed, considering the issues Mr. Wolff had with his sinuses during the five weeks he was at the MDC, it is apparent this could be a real problem for Mr. Wolff if he does not receive the prescribed medicine he needs to treat this illness during incarceration. (*Id.*).  It should be noted, though, that this medical condition is not so severe that it requires daily attention from medical personnel; as long as Mr. Wolff is allowed to have the prescribed medicine he needs to treat his sinusitis, this is a condition he can manage on his own, without the

need to be incarcerated at a facility with advanced medical services. We simply request that the Court so order.  Mr. Wolff's physician also recommends, and the probation officer concurs, that Mr. Wolff have his PSA tested twice a year.  This is a simple test that does not require advance medical services.

### B.   Prison Facility Request

Mr. Wolff respectfully requests that the Court recommend to the Bureau of Prisons ("BOP") that he be placed at FCI-Lompoc, California, at the satellite prison camp or at the lowest applicable security designation available at that facility.   Alternatively, Mr. Wolff requests that the Court recommend to the BOP that he be placed at CI-Taft, California to serve his sentence in the lowest applicable security designation at that facility.

## X.   Conclusion

In any criminal case, it is difficult to convey to the Court the essence of the individual to be sentenced--his character, his accomplishments, his background, and the other factors that place the offense in the context of the defendant's entire life.  There is no question Mr. Wolff made a terrible mistake nine years ago and this Court will punish him for that transgression.   We believe and respectfully request that three years incarceration is sufficient, but not greater than necessary, to justly address Mr. Wolff's offense.  Moreover, as reflected in all of the letters attached hereto, Mr. Wolff has been a wonderful father to his children, who will suffer the most from his absence over the next few years.  As one court recently noted:

> "But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.   This elementary principle of weighing the good with the bad, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson,* 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006), aff'd mem., 301 Fed.Appx. 93 (2d Cir. 2008).

We respectfully urge the Court to impose a three year sentence in this matter.

DATED:  March 31, 2010                  Respectfully submitted,

                                        GREENBERG TRAURIG, LLP


                                        /s/ John F. Gibbons
                                        JOHN F. GIBBONS

                                        /s/ Daniel D. Rubinstein
                                        DANIEL D. RUBINSTEIN


                                        Attorneys for Defendant,
                                        STUART H. WOLFF

DEFENDANT STUART WOLFF'S SUBMISSION CONCERNING SENTENCING