ANDRÉ BIROTTE JR.
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
MICHAEL J. RAPHAEL (Cal. Bar # 208232)
Assistant United States Attorney
Chief, Appeals Section
MICHAEL R. WILNER (Cal. Bar # 156592)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3391/0687
     Facsimile: (213) 894-6269
     E-mail:   michael.raphael@usdoj.gov
               michael.wilner@usdoj.gov
Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 05-398-GAF |
| Plaintiff, | **GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING POSITION** |
| v. | |
| STUART H. WOLFF, | Sentencing Date: April 19, 2010<br>Time: 1:30 p.m. |
| Defendant. | |

*
*
*
*
*
*
*
*

**MEMORANDUM OF POINTS AND AUTHORITIES**

After reviewing defendant's sentencing filing, the government reiterates its request for a 60-month sentence for defendant Wolff. The government does not challenge the sincerity of the moving letters submitted by Wolff's family and friends. However, as to certain of the issues raised in defendant's filing, the government offers the following brief responses.

**1.   Loss Calculation**

Defendant quarrels with the methodology by which the government and the Probation Office calculate the approximate loss for sentencing purposes. While acknowledging that the loss figures from any applicable method would likely lead to a sentencing guideline range well over the statutory maximum, Wolff argues that the government's analysis is "simplistic," fails to identify the specific shareholders who lost money due to defendant's confessed crime, and does not reflect an "economically sound basis" linking the Homestore fraud to shareholder losses. (Defendant's Sentencing Memorandum at 29-32.)

Defendant sets the sentencing bar unfeasibly and unnecessarily high. The law does not require the government to prove the precise loss that each shareholder incurred during the period of the fraud. It is obviously not possible for the government to interview all of the Homestore shareholders who bought or held the company's stock during 2001 regarding the

losses caused by the fraud scheme.[1]  Indeed, the Ninth Circuit rejected such a direct, causation-of-loss analysis in <u>United States v. Berger</u>, 587 F.3d 1038 (9th Cir. 2009).  In doing so, the Court emphasized that the goal of sentencing is to calculate a reasonable estimate of the loss at issue within the extremely large bands under the guidelines.  To do this, the loss calculation in corporate fraud cases sensibly focuses on the movement of a company's stock price in the face of market reaction to fraudulent -- and then truthful -- information about the issuer.

This concept is not difficult to apply in the case of Homestore.  During the spring and summer of 2001, Wolff and other Homestore's executives lied to shareholders about the company's revenue.  Those lies fraudulently made the company look successful in achieving publicly stated goals.  The stock price remained high.  During the autumn of 2001, there was growing concern that Homestore could not continue to hit its revenue targets.  The stock price fell, and fell further when the company admitted that it missed its third quarter targets.  There was no suspicion of fraud, though, until December 2001.  At that point, trading of the stock was suspended.  When Homestore published its corrected, truthful financial statements in February 2002 --

---

[1]  According to the company's press releases and other public filings, Homestore stock was widely held by institutional and individual investors.  The stock was traded on the Nasdaq National Market in 2001, which was the highest tier of that exchange.  Homestore was a member of the Russell 1000 stock index and its stock was purchased by numerous mutual funds.  Based on publicly available trading information, approximately 360 million shares changed hands during the April-December 2001 fraud period.

wiping out the phony results that Wolff fed to the market during the previous year -- the stock price dropped yet again.

The government's reasonable estimate of the loss caused to Homestore investors during that period is roughly $1.6 billion. The method used to make that calculation is economically sound and has been endorsed by numerous courts. It is also well corroborated by alternative loss calculations that, while more favorable to Wolff at sentencing, all far exceed the highest guideline enhancement in existence at the time of the crime.[2] In evaluating a fraud scheme that nearly bankrupted a legitimate, widely traded company, the government's methodology is accurate and reliable at sentencing.

**2.   Comparisons to Co-Defendants**

In arguing for the minimum sentence under the plea agreement, Wolff compares himself to his former Homestore colleagues and convicted co-conspirators. Two of those comparisons are particularly inapt and unsupported factually.

First, Wolff argues that his relative role in the offense is less than that of co-defendant Executive Vice President Peter

---

[2] Defendant's claim that Homestore stock resumed trading in January 2002 at a higher price (leading to a lower sentencing loss figure) is literally true but extremely misleading. (Defendant's Sentencing Memorandum at 31 n.11.) Those trades did not occur on the Nasdaq market or during a period when Homestore was listed on a national exchange. Rather, they appear to be off-market trades required to be reported publicly.

Of crucial importance, the trades could not have been based on accurate information regarding Homestore's finances; that information wasn't available until the company filed its restated financial results with the SEC in late February 2002. There is no point in measuring the market's valuation of Homestore until that corrected information was released.

Tafeen (whom defendant calls the "mastermind and architect" of the fraud scheme) and CFO Joe Shew (called the "day-to-day implementer" of the scheme), and equivalent to that of COO John Giesecke (who "green-lighted" the scheme with Wolff). (Defendant's Sentencing Memorandum at 28.)  Wolff posits that his pre-retrial plea should put him on roughly the same footing as those individuals for purposes of receiving a minimal sentence.

That analysis unfairly ignores the prompt guilty pleas and acceptance of responsibility of Shew and Giesecke, and dismisses the significance of the cooperation that all three executives provided in the original trial of Wolff.  Shew and Giesecke pled guilty <u>eight years</u> ago, within a few months of the commencement of the criminal investigation into Homestore.  Wolff's last-minute plea does not compare in any way to the situation of those individuals.  Additionally, the lenient sentences imposed on all three cooperators were premised on favorable and substantial government motions under USSG § 5K1.1 for the lengthy pre-trial and trial assistance that Shew, Giesecke, and Tafeen provided against Wolff and others.  Wolff acknowledges that he provided no such assistance nor did he plead guilty promptly, so he is not similarly situated to those individuals and not entitled a similar sentence here.

Secondly, Wolff persists in describing himself as having sold a minimal percentage of his stock holdings.  This implies that Wolff's actions were less nefarious than other executives who sold "the vast majority of their stock holdings." (Defendant's Sentencing Memorandum at 33).  In fact, Wolff received far more stock options from Homestore than any other

4

executive. He also sold far more Homestore stock during the fraud period than all of his co-conspirators, earning more illegal profits for himself than any of the others received from their sales.

The key difference between Wolff's stock position and that of the other executives is that Wolff received a major loan from Homestore as part of his compensation. That loan allowed Wolff to convert his vested stock options into actual shares of stock. This technique gave Wolff a considerable tax benefit (long term capital gains) when it came time to sell his Homestore stock. It also gave him a bigger supply of stock to sell than lower level executives who simultaneously exercised their stock options and sold stock periodically.[3] There is little insight to be gained

---

[3] As COO Giesecke explained at trial, he received a loan of this type that was significantly smaller than the one that Wolff received:

    A.    [P]rior to going public, substantially all of Wolff's options were vested, and the company provided him with a significant loan to exercise all of his options into stock.

    Q.    Did you get those benefits? That is, the accelerated vesting of your options and a loan to convert the options into stock?

    A.    I was not -- none of my options were accelerated in terms of vesting. I was provided a loan to exercise a certain number of my options into stock.

    Q.    What was the size of that loan?

    A.    I believe it was in the -- well, I don't recall the exact amount.

    Q.    Was it more or less than Defendant Wolff's loan?

    A.    Substantially less.

(RT 4/11/06: 147).

for sentencing where CEO Wolff used the company's money to convert all of his options to free-trading stock, yet the other executives were not financially able to do so.  In other words, the "percentage of stock sold during the scheme v. total stock holdings" that Wolff emphasizes in his chart is comparatively low only because the amount of his stock holdings was skewed by his favorable compensation package as Homestore's CEO.  It says nothing about his criminal intent or actions during the scheme.

**3.   Restitution**

Wolff's attempt to play "Let's Make a Deal" on the restitution issue is meritless.  Wolff has consistently reported assets to the government as a term of his 2006 post-trial release that are millions of dollars greater than the $8+ million that he took from shareholders when he sold stock during the revenue inflation scheme.

Now that the time for sentencing approaches, though, defendant reports that these assets have shrunk in "liquidation value."  This includes a 20% decrease overnight in the reported value of his home and a 60% decrease in the reported market value of his hedge fund investments.  <u>Compare</u> Defendant's Exhibit T at pages 80-81 <u>with</u> pages 82-83.

Instead, Wolff simply makes up a $5 million figure that he is willing to pay in restitution over the course of time.  He couches this request in terms of fairness to his family and his purported inability to pay full restitution.  However, Wolff is not entitled to negotiate the terms of his restitution order here.  As set forth in the government's original position, restitution is mandatory here under 18 U.S.C. § 3663A for Wolff's

6

conspiracy conviction.  His ability to pay is irrelevant to the analysis and should be disregarded.  The Court should enter the full $8 million restitution order as requested by the government to compensate the victims of this offense.[4]

**4.  Wolff's Lack of Acceptance of Responsibility**

In his sentencing papers, Wolff seeks to convince the Court that he "is truly sorry for his actions, takes full responsibility for his conduct," and "knows now that his actions were and remain wrong."  (Defendant's Sentencing Memorandum at 1, 11.)  Defendant also takes umbrage with the government's description of his guilty plea as "grudging."

On this issue, Wolff can only be judged by his own conduct, not his attorney's well-crafted words.  From 2002 through the approach of the 2010 trial in this case, Wolff refused to admit his involvement in the fraud scheme.  Moreover, at his 2006 trial -- long enough after the criminal events and his co-conspirators' guilty pleas for Wolff to reflect on his situation -- Wolff voluntarily took the witness stand on his own behalf.

He did not come close to accepting responsibility for the fraud at his company.  To the contrary, Wolff flat-out denied the key events at which his colleagues and subordinates spoke with him directly about the plot.  While Wolff need not receive an enhancement for obstruction of justice based on this testimony,

---

[4] Wolff's comparisons to the restitution order for co-defendant Tafeen are inapposite.  Tafeen pled guilty to an insider trading offense under Title 15 that was not subject to mandatory restitution under 18 U.S.C. § 3663A.  As such, the government agreed to a lower restitution amount for Tafeen. However, Tafeen faced a much higher maximum custody term on his conviction (10 years in prison versus 5 years for Wolff's conspiracy conviction) at sentencing than Wolff.

1  it should weigh heavily in the Court's decision as to whether
2  grant him the benefit of acceptance of responsibility at
3  sentencing.  See, e.g., USSG § 3E1.1, com. n.1(h) (timeliness of
4  defendant's conduct in accepting responsibility is a relevant
5  factor).

6      For example, Tafeen testified that he described the
7  fraudulent roundtrip deals to Wolff in a blunt, direct manner
8  using a whiteboard in Wolff's office in the spring of 2001.
9  Wolff's testimony on that issue denied that such a discussion
10 ever happened:

>            Q.   [P]rior to the telephone call on
>                 April 25, 2001, what conversations,
>                 if any, had you had with Peter
>                 Tafeen about the first quarter AOL
>                 transactions?
>
>            A.   Nothing that comes to my
>                 recollection.  He had mentioned,
>                 you know, that he had an AOL deal,
>                 and I think that was it.  No
>                 details or anything to that effect.
>
>            Q.   What, if anything, do you recall
>                 about discussions in your office
>                 and Mr. Tafeen using a white board?
>
>            A.   I don't ever remember him using a
>                 white board in the four or five
>                 years that I knew him, frankly.  So
>                 I don't have any recollection of
>                 that event.

22 (RT 6/19/06: 6.)
23     Similarly, Shew testified about several conversations with
24 Wolff during 2001 in which Shew discussed the fraudulent deals
25 with Wolff.  Shew expressly stated told Wolff that Shew did not
26 want to sign Homestore's quarterly statements or lie to the
27 company's auditors any further.  Wolff professed a different, far
28

more benign recollection of the most crucial discussion in July 2001, which was well into the heart of the scheme:

> A. And then [Shew] proceeded to say that he was uncomfortable dealing with -- they were going through the review process with PWC. He said that his team was burned out and tired and he was burned out and tired. And he did say that he had some level of discomfort with respect to PWC. . . . I didn't understand it.
>
> * * *
>
> He walked out, and I remember sitting back in my chair thinking, you know, "What just happened here?"
>
> * * *
>
> And I went back in his office. . . And I said, "Joe, you know, this conversation we just had, were you trying to tell me that we have accounting issues here?"
>
> And he reflected, and he said, "Well, I would say they're gray."
>
> * * *
>
> And I said, "Well, good gray or bad gray?"
>
> And he looked me in the eye, and he said, "Good gray."
>
> So I said, "Okay," and I left, and I considered that the matter -- that we were okay with respect to accounting.

(RT 6/15/06: 100-02.)

There was considerable testimony presented at trial that Wolff -- the founder of Homestore, an extremely intelligent and shrewd businessman, and a micromanager of the highest order -- was briefed about the implementation of the fraudulent roundtrip

9

deals throughout 2001.  In his defense, Wolff denied ever even hearing the deals described in shorthand:

> Q. During 2001 or at least prior to the middle of November 2001, do you recall anyone using the term "round-trip transactions?"
>
> A. Never.
>
> Q. Do you recall anybody using the term "triangular transactions?"
>
> A. No, sir.
>
> Q. "Home run?"
>
> A. Never.

(RT 6/19/06: 7).

    Wolff's sworn testimony in 2006 is indicative of his attitude since the discovery of the fraud at Homestore.  Wolff has continually denied involvement in the pervasive misconduct of his key lieutenants and their subordinates.  To the extent he admitted knowing about aspects of the scandal, Wolff expressed uncharacteristic befuddlement, confusion, or lack of insight. Wolff's selective memory is thoroughly discredited by compelling proof that he was, in fact, a key player in this significant financial scandal.  The government respectfully requests that the

Court ignore Wolff's eve-of-sentencing claim that he has accepted responsibility for his misconduct here.

Dated: April 13, 2010                Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

            /s/ AUSA Wilner
_____
MICHAEL J. RAPHAEL
MICHAEL R. WILNER
Assistant United States Attorneys

Attorneys for Plaintiff
United States of America